# No. 24-12966

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————————

KYLIE MCKENZIE,

*Plaintiff-Appellee*,

v.

UNITED STATES TENNIS ASSOCIATION INCORPORATED;
USTA PLAYER DEVELOPMENT INCORPORATED,

*Defendants-Appellants*.

————————————

On Appeal from the United States District Court
for the Middle District of Florida, No. 6:22-cv-00615-PGB-LHP
Hon. Paul G. Byron

————————————

## BRIEF FOR APPELLANTS

————————————

Kevin W. Shaughnessy
Meagan L. Martin
BAKER & HOSTETLER LLP
200 S. Orange Avenue
Suite 2300
Orlando, FL 32801
(407) 649-4000

Jeffrey S. Bucholtz
Paul Alessio Mezzina
Amy R. Upshaw
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-050
jbucholtz@kslaw.com

*Counsel for Appellants*

December 18, 2024

No. 24-12966

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with 11th Cir. Rule 26.1-1(a), the following is a list of all known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations with an interest in the outcome of this case or appeal:

1.   Ackerbaum Cox, Joyce, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

2.   Allard, Robert, counsel for Plaintiff-Appellee Kylie McKenzie

3.   Arch Capital Group Ltd. [ACGL], parent company of Arch Insurance North America

4.   Arch Insurance North America, insurance carrier (as successor in interest to Allianz Global Corporate & Specialty SE) for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

5.   Baker & Hostetler LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

6.   Boskovich, Mark J., counsel for Plaintiff-Appellee Kylie McKenzie

7.   Byron, Hon. Paul G., U.S. District Court Judge

8.   Bucholtz, Jeffrey S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

No. 24-12966

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

9. Cerri, Boskovich & Allard, LLP, counsel for Plaintiff-Appellee Kylie McKenzie

10. Freeman, E. Caroline, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

11. Hoffman Price, Hon. Leslie, U.S. Magistrate Judge

12. Judkins, Amy L., counsel for Plaintiff-Appellee Kylie McKenzie

13. King & Spalding LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

14. Luka, Maegen Peek, counsel for Plaintiff-Appellee Kylie McKenzie

15. Martin, Meagan L., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

16. McKeever & Seidule, counsel for Plaintiff-Appellee Kylie McKenzie

17. McKenzie, Kylie, Plaintiff-Appellee

18. Mezzina, Paul Alessio, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

19. Newsome Melton, P.A., counsel for Plaintiff-Appellee Kylie McKenzie

20. Normand, Edmund A., counsel for Plaintiff-Appellee Kylie McKenzie

21. Normand Law, PLLC, counsel for Plaintiff-Appellee Kylie McKenzie

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

22. Sales, Erin M., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

23. Seidule, Nicholas D., counsel for Plaintiff-Appellee Kylie McKenzie

24. Shaughnessy, Kevin W., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

25. Soles, Maureen B., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

26. United States Tennis Association Incorporated, Defendant-Appellant

27. Upshaw, Amy R., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

28. USTA Player Development Incorporated, Defendant-Appellant

29. Weber, William S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the United States Tennis Association Incorporated and USTA Player Development Incorporated certify that they are not a publicly held corporation, they have no parent company, and no publicly held company has 10% or greater ownership in the United States Tennis Association Incorporated or USTA Player Development Incorporated.

No. 24-12966

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

Dated: December 18, 2024

Respectfully submitted,

*s/Jeffrey S. Bucholtz*

Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-050
jbucholtz@kslaw.com

*Counsel for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted because this case presents multiple important questions of law that implicate the role of the jury, core elements of Florida law, and the federal scheme governing claims of abuse and misconduct towards athletes in the United States.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF AUTHORITIES ....................................................... iv

INTRODUCTION ..................................................................... 1

JURISDICTION ....................................................................... 4

STATEMENT OF THE ISSUES ............................................... 5

STATEMENT OF THE CASE .................................................. 5

    A.    Legal Framework ....................................................... 5

    B.    Factual Background ................................................... 7

          1.    USTA Takes a Proactive Approach to Player
              Safety ................................................................ 7

          2.    Plaintiff Moved to Florida as an Adult to Train
              at USTA's Orlando Campus ........................... 12

          3.    Aranda Assaulted Plaintiff, and USTA Took
              Immediate Action ......................................... 14

          4.    The Center's Investigation Uncovered that
              Four Years Earlier, Aranda Had Touched a
              USTA Employee Inappropriately ................. 17

          5.    The Center Suspended Aranda, and USTA
              Banned Him for Life ..................................... 19

    C.    Procedural Background ......................................... 20

STANDARD OF REVIEW...................................................... 25

SUMMARY OF ARGUMENT ................................................. 26

ARGUMENT .........................................................................28

I.    USTA Is Entitled to Judgment as a Matter of Law or a
      New Trial on Plaintiff's Claim for Negligent Supervision
      and Retention ................................................................28

      A.    USTA Did Not Know Aranda Was Unfit for His Job ..........29

      B.    At Minimum, the Claim of Negligent Retention and
            Supervision Should Have Been Decided by the Jury ...........37

II.   USTA Is Entitled to Judgment as a Matter of Law or a
      New Trial on Plaintiff's Negligence Claim.....................................42

      A.    There Was Extensive Evidence that USTA
            Exercised Reasonable Care to Protect All Players in
            Its Training Program ..............................................................43

      B.    At Minimum, the Jury Was Entitled to Determine
            Whether USTA Exercised Reasonable Care ...........................50

III.  USTA Is Entitled to Judgment as a Matter of Law on
      Punitive Damages ...........................................................................53

CONCLUSION .........................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................ 33

*ADT LLC v. Safe Home Security Inc.*,
    2022 WL 2805252 (S.D. Fla. May 18, 2022) ....................... 60

*Anderson v. Walthal*,
    468 So. 2d 291 (Fla. 1st DCA 1985) ..................................... 29

*Banosmoreno v. Walgreen Co.*,
    299 F. App'x 912 (11th Cir. 2008) ....................................... 42

*Bloch v. Ribar*,
    156 F.3d 673 (6th Cir. 1998) ................................................ 33

*Bradenton Mall Associates v. Hill*,
    508 So. 2d 538 (Fla. 2d DCA 1987) ............................... 59, 60

*Chang v. JPMorgan Chase Bank, N.A.*,
    845 F.3d 1087 (11th Cir. 2017) ............................................ 29

*Consumers' Rsch. v. FCC*,
    88 F.4th 917 (11th Cir. 2023) ............................................... 33

*Dickinson v. Gonzalez*,
    839 So. 2d 709 (Fla. 3d DCA 2003) ..................................... 39

*Dickson v. Graham-Jones Paper Co.*,
    84 So. 2d 309 (Fla. 1955) .................................................... 38

*Discount Tire Co. v. Bradford*,
    373 So. 3d 399 (Fla. 5th DCA 2023) .............................. 42, 48

*Doe v. ATC, Inc.*,
    624 S.E.2d 447 (S.C. Ct. App. 2005) ................................... 39

*Dupree v. Younger*,
    598 U.S. 729 (2023) .............................................................. 31

*EEOC v. Massey Yardley Chrysler Plymouth, Inc.*,
   117 F.3d 1244 (11th Cir. 1997)..................................................3, 25, 50

*EEOC v. W&O, Inc.*,
   213 F.3d 600 (11th Cir. 2000)............................................................25

*First Bond & Mortg. Co. v. Yancey*,
   139 So. 597 (Fla. 1932)......................................................................36

*Fla. Power & Light Co. v. Dominguez*,
   295 So. 3d 1202 (Fla. 2d DCA 2019) .................................................60

*Garcia v. Duffy*,
   492 So. 2d 435 (Fla. 2d DCA 1986) .............................................29, 39

*Gerber Children's Ctrs., Inc. v. Harris ex rel. Harris*,
   484 So. 2d 91 (Fla. 5th DCA 1986).....................................................59

*Handley v. Werner Enters., Inc.*,
   2023 WL 6628921 (11th Cir. Oct. 11, 2023)...........................3, 25, 50

*M.V. ex rel. W.W.*
   *v. Gulf Ridge Council Boy Scouts of Am., Inc.*,
   529 So. 2d 1248 (Fla. 2d DCA 1988) .................................................38

*Malicki v. Doe*,
   814 So. 2d 347 (Fla. 2002) .................................................................39

*Mee Indus. v. Dow Chem. Co.*,
   608 F.3d 1202 (11th Cir. 2010)..........................................................25

*Meyers v. Ramada Hotel Operating Co.*,
   833 F.2d 1521 (11th Cir. 1987)..........................................................42

*Mizener v. Carnival Corp.*,
   2006 WL 8430159 (S.D. Fla. June 16, 2006) .....................................52

*Napleton's N. Palm Auto Park, Inc. v. Agosto*,
   364 So. 3d 1103 (Fla. 4th DCA 2023)................................................54

*Nesbitt v. Cmty. Health of S. Dade, Inc.*,
   467 So. 2d 711 (Fla. 3d DCA 1985) ...................................................48

*Page v. Choice Hotels Int'l, Inc.*,
   2005 WL 1106893 (W.D. Mich. Apr. 18, 2005) ..................................52

*Pinnacle Prop. Mgmt. Servs., LLC v. Forde*,
   372 So. 3d 292 (Fla. 4th DCA 2023) ...................................................60

*Pozzi Window Co. v. Auto-Owners Ins.*,
   446 F.3d 1178 (11th Cir. 2006) ...........................................................54

*Radtke v. Lifecare Mgmt. Partners*,
   795 F.3d 159 (D.C. Cir. 2015) .............................................................25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ............................................................................25

*Schulz v. Pa. R.R.*,
   350 U.S. 523 (1956) ............................................................................43

*Steinberg ex rel. Steinberg v. Lomenick*,
   531 So. 2d 199 (Fla. 3d DCA 1988) ...................................................48

*Valladares v. Bank of Am. Corp.*,
   197 So. 3d 1 (Fla. 2016) .................................................................4, 53

*Whetzel v. Metro. Life Ins. Co.*,
   266 So. 2d 89 (Fla. 4th DCA 1972).....................................................37

**Statutes**

28 U.S.C. § 1291...........................................................................................4

28 U.S.C. § 1332...........................................................................................4

36 U.S.C. § 220541...................................................................................6, 32

36 U.S.C. § 220542...............................................................................7, 11, 45

Amateur Sports Act of 1978,
   Pub. L. No. 95-606, 92 Stat. 3045.........................................................6

Protecting Young Victims from Sexual Abuse and Safe Sport
    Authorization Act of 2017,
    Pub. L. No. 115-126, 132 Stat. 318 (2018) ...................................... 6, 34

Fla. Stat. § 768.72 .............................................................................. 4, 54

Fla. Stat. § 768.725 ............................................................................ 4, 54

## Rules

Fed. R. Civ. P. 50(a) ............................................................................. 25

## Other Authorities

3 William Meade Fletcher,
    Fletcher Cyclopedia of the Law of Corporations
    (perm. ed. 1931) ................................................................................ 38

9B Wright & Miller,
    Federal Practice & Procedure § 2535 (3d ed.) .................................... 26

Fla. Civ. Jury Instr. 503.1(b) ................................................................ 54

U.S. Ctr. for SafeSport,
    Minor Athlete Abuse Prevention Policies (Jan. 5, 2024) ................... 46

## INTRODUCTION

The United States Tennis Association Incorporated and USTA Player Development Incorporated (jointly, "USTA") are firmly committed to protecting athletes from sexual misconduct. The many measures USTA takes to provide a safe environment for players include employee background checks; mandatory annual training on preventing and recognizing misconduct; strict policies defining misconduct; and a training campus designed to be easily observed by supervisors, staff, and visitors.

Anibal Aranda violated USTA's policies by sexually assaulting Plaintiff Kylie McKenzie when she was a 19-year-old participant in USTA's Player Development program, where he was a coach. Within hours of Plaintiff reporting the assault, USTA took immediate action to suspend Aranda and bar him from the training campus pending investigation. USTA immediately conveyed Plaintiff's report to the U.S. Center for SafeSport, the federally chartered entity responsible for investigating claims of sexual misconduct in Olympic sports. The Center found that Aranda had assaulted Plaintiff and imposed a two-year suspension. USTA went further and banned him for life.

Despite USTA's precautions and expert testimony that USTA complied with the standard of care, including by following every policy required by the Center for SafeSport, the district court took the extraordinary step of granting judgment as a matter of law *for Plaintiff* on the core disputed issues. The court held as a matter of law that USTA had been negligent and had negligently retained and/or supervised Aranda. The jury awarded $3 million in compensatory damages and $6 million in punitive damages.

This Court should reverse and direct entry of judgment as a matter of law in favor of USTA. There was no basis to find that USTA knew Aranda was unfit to be a coach. The district court held otherwise only because it imputed to USTA an employee's knowledge of an incident years earlier in which Aranda groped that employee while drinking and dancing at a nightclub. There was no legal basis for charging USTA with knowledge of that incident, which was never reported to USTA. And even if USTA could be charged with such knowledge, the nightclub incident did not make it foreseeable that Aranda would assault a player in a professional setting. Nor was there any evidence that USTA was negligent. To the contrary, the evidence showed that USTA exercised

reasonable care to protect players. The district court concluded that USTA acted negligently by (i) not ensuring continuous, real-time video monitoring of Plaintiff's practice sessions and (ii) not ensuring that a third person was present at all times during those sessions. But all the evidence at trial—including unrebutted expert testimony—indicated that the standard of care did not require those extreme measures.

At the very least, the district court erred by taking these issues from the jury and deciding them as a matter of law in favor of Plaintiff. "[G]ranting judgment as a matter of law in favor of a party bearing the burden of proof," as the court did here, is "an 'extreme step' which 'can be done only when the evidence favoring the claimant is so one-sided as to be of overwhelming effect.'" *Handley v. Werner Enters., Inc.*, 2023 WL 6628921, at *3 (11th Cir. Oct. 11, 2023) (per curiam) (quoting *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997)). Here, even if the evidence could have (barely) permitted a jury to find USTA negligent, it was nowhere near "overwhelming" enough to justify usurping the jury's role in resolving factual disputes. At minimum, therefore, the Court should vacate the judgment and order a new trial.

Moreover, if the Court were to order a new trial, it should hold as a matter of law that USTA cannot be liable for punitive damages. Florida law permits punitive damages only upon "clear and convincing evidence" of "gross negligence" "equivalent to the conduct involved in criminal manslaughter." Fla. Stat. §§ 768.72(2), 768.725; *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016). If USTA was negligent at all, its negligence surely did not rise to that extreme level. The district court concluded otherwise only by misstating the evidence and ignoring USTA's clear and demonstrated commitment to protecting its players from nonconsensual sexual conduct.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000. Dkt.201-1 at 1. The court entered judgment on May 7, 2024, Dkt.231, and denied USTA's renewed motion for judgment as a matter of law, new trial, or remittitur on August 16, 2024, Dkt.247. USTA timely filed its notice of appeal on September 12, 2024. Dkt.251. This Court has jurisdiction under 28 U.S.C. § 1291, as

4

discussed in the parties' joint response to this Court's Jurisdictional Question. COA.Dkt.25; *see* COA.Dkt.26-2.

## STATEMENT OF THE ISSUES

1.    Did the district court err in denying USTA judgment as a matter of law and granting Plaintiff judgment as a matter of law on the notice and breach elements of her negligent-supervision-and-retention claim?

2.    Did the district court err in denying USTA judgment as a matter of law and granting Plaintiff judgment as a matter of law on the breach element of her negligence claim?

3.    Did the district court err in denying USTA judgment as a matter of law on the issue of punitive damages?

## STATEMENT OF THE CASE

### A.    Legal Framework

The U.S. Olympic and Paralympic Committee is a federally chartered, nonprofit corporation that coordinates Olympic sports. Dkt.260 at 43; Dkt.265 at 56-57. The Committee certifies a national governing body for each sport. Dkt.265 at 57. USTA is the national governing body for tennis. *Id.* The Committee historically supported national governing bodies like USTA by providing resources like

5

recommended best practices. Dkt.260 at 42; *see* Amateur Sports Act of 1978, Pub. L. No. 95-606, § 1(b), 92 Stat. 3045, 3046.

In 2012, the Committee proposed establishing mandatory standards for national governing bodies. Dkt.260 at 46, 49. Although this shift sparked some initial concern, USTA fully complied with the Committee's standards. *Id.* at 46-47, 49-50; *see* Dkt.226-9; Dkt.226-10. When the Committee proposed to modify its policies or impose new standards, USTA would offer comments to provide insight into how those polices could play out in practice. *See, e.g.*, Dkt.226-10 (offering comments in 2015 on a proposed *per se* bar on consensual relationships between professional players and coaches).

In 2017, the Olympic Committee chartered the U.S. Center for SafeSport. *See* Dkt.264 at 212-13. The next year, Congress codified the Center's role. Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, Pub. L. No. 115-126, § 202, 132 Stat. 318, 320 (2018). The Center exercises jurisdiction over the Olympic Committee and national governing bodies to protect amateur athletes against abuse. 36 U.S.C. § 220541(a)(1)(B). The Center has authority to investigate and resolve allegations of sexual abuse. *Id.* § 220541(a)(1)(D).

6

Congress instructed the Center to "develop training, oversight practices, policies, and procedures" for national governing bodies to implement "to prevent the abuse … of amateur athletes." *Id.* § 220542(a)(1)(C). The Center published its first "SafeSport Code" in 2017 and periodically revises that policy. Dkt.265 at 57; *see* Dkt.95-6 (Center's 2018 Code, also filed at Dkt.225-6).

### B.    Factual Background

### 1.    USTA Takes a Proactive Approach to Player Safety.

USTA and USTA Player Development are nonprofit entities that promote the development of tennis. Dkt.260 at 23, 73. USTA is responsible for developing the rules of tennis, conducting tournaments, and providing resources for the tennis community. *Id.* Through its Player Development program, USTA also helps develop top players. *Id.* at 23. Players in the program can benefit from free training—at one of USTA's training centers or at home with a coach the player selects—as well as financial support, such as grants to pay for travel and housing during training and tournaments. *Id.* at 120-21, 125-27, 138-39.

USTA has long taken a proactive approach to player safety. Since 2013—long before the Center for SafeSport promulgated its Code—USTA

has implemented its own "SafePlay" policies and procedures to help support a safe environment for athletes. *Id.* at 24-25. USTA has also long coordinated with the Olympic Committee and the Center and engaged with them regarding their proposed policies. *See* Dkt.226-8 at KM00199; Dkt.226-10. USTA's policies have continually evolved as USTA and other governing bodies learn more about best practices to keep athletes safe. Dkt.260 at 76-77.

It is undisputed that USTA has also fully implemented the Center's Code. At trial, Dr. Monica Applewhite testified as an expert on the standards of care for preventing, detecting, and responding to sexual misconduct in organizations. Dkt.264 at 195, 204. Dr. Applewhite explained that in 2018, when Plaintiff was assaulted, every protection the Code required was "in place at USTA"—and had been since at least 2014. *Id.* at 214. USTA had in place every policy the Center required (and more) and followed those policies. *Id.* at 214-16, 218-20. USTA has clear policies outlining permissible and impermissible conduct. *Id.* at 217. USTA has always prohibited any sexual conduct without consent. *See, e.g.*, Dkt.225-4 at 3 (2017 SafePlay Policy); Dkt.225-5 (2017 Sexual Misconduct Policy). It has a "comprehensive program" to prevent such

8

misconduct, including training modules. Dkt.264 at 215-16. USTA requires its staff to complete training on USTA's safety program on a regular basis. *Id.* at 215-16, 219-20; *see* Dkt.225-4 at 10-11. Plaintiff offered no evidence to counter the expert's conclusions.

One key element of USTA's policies is that employees must be "SafePlay-approved." Dkt.260 at 77. To be SafePlay-approved, an individual must complete a criminal background check, acknowledge and agree to the SafePlay policies, and complete annual training provided by the Olympic Committee and later by the Center. *Id.* at 77-78, 82-83; Dkt.265 at 51-52. USTA also conducts reference checks on coaches it hires. Dkt.260 at 78.

At least since 2017, USTA's website has included a searchable database of SafePlay-approved coaches. *Id.* at 97. Lauren Tracy, who has overseen USTA's SafePlay program since 2013, monitors any accusations of sexual misconduct against anyone connected to tennis. *Id.* at 25, 71, 96. Between 2013 and mid-2018, USTA became aware of 27 reports or allegations of sexual abuse, through either Tracy's proactive efforts or information provided to USTA by other tennis organizations. *Id.* at 66-

67, 101-02. None of those 27 reports concerned a USTA employee. *Id.* at 102-03.

USTA applied all these policies to Anibal Aranda. USTA hired Aranda as a part-time assistant coach in 2012 and as a full-time coach in 2014. USTA conducted background checks on Aranda three times—in 2012, 2013, and 2017—and conducted a reference check. *Id.* at 78-80. Every background check was clear. *Id.* at 81.

Aranda completed his annual Center training in February 2018. Dkt.265 at 58; *see* Dkt.227-4. In addition to that Center-required training, Tracy, who was then USTA's director of strategic initiatives as well as USTA's primary contact with the Center, conducted two additional in-person trainings in 2018 for all Player Development coaches and staff. Dkt.260 at 82, 86-87. In April, she trained them on USTA's SafePlay program and on appropriate behaviors and communications with athletes. *Id.* at 86. And in October, she provided an in-depth training on USTA's policies, including guidelines on one-on-one interactions and avoiding being alone with a minor athlete. *Id.* at 82.

USTA has also adopted other proactive safeguards that go beyond merely implementing the Center's Code, including "best practices"

guidelines that set standards for professional boundaries. *See* Dkt.225-4 at 9-10. The best practices are not strict requirements but "should be abided by to the greatest extent possible." *Id.* at 10. One best practice is that "[i]nteraction with participants should be in an open and observable environment." *Id.* As another example, USTA strongly discourages having a device with audio or video recording capability in any restroom, changing area, or locker room. *Id.*

When Congress instructed the Center to develop policies for national governing bodies to implement, it specified that the Center should develop "reasonable procedures to limit one-on-one interactions, including communications, between an amateur athlete who is a minor and an adult … at a facility under the jurisdiction of a national governing body without being in an observable and interruptible distance from another adult." 36 U.S.C. § 220542(a)(2)(F). USTA has had a policy limiting one-on-one interactions between adults and minors since before the Olympic Committee began issuing guidelines. *See* Dkt.260 at 38-41; Dkt.225-4 at 17. USTA calls its policy the rule of three. Dkt.225-4 at 10. The policy states that as a best practice, "a minimum of three persons (two adults and one teen or child; or one adult and two teens or children)

should be present at all times during USTA events" and an adult "should strive to avoid being alone with a single child or teen where he or she cannot be observed by others." *Id.*

### 2. Plaintiff Moved to Florida as an Adult to Train at USTA's Orlando Campus.

Around August 2018, when Plaintiff was nineteen years old, she moved to Florida to train at USTA's new center in Orlando. Dkt.265 at 58-59. While training there, Plaintiff lived with family members. Dkt.260 at 156. She also occasionally stayed with a friend and fellow player, CiCi Bellis, who lived near the training center. *Id.*

For the first few months she trained at the Orlando campus, Plaintiff worked with several different coaches, including Bellis's coach, Aranda. Dkt.263 at 238-39. Plaintiff thought her initial practices with Aranda went well. *Id*. She had never heard any negative comments about Aranda from Bellis or anyone else. Dkt.264 at 70-71.

After Bellis suffered an injury and could not practice on court for a period, Aranda had additional time. Dkt.260 at 243-44. So, in mid-October 2018, Aranda began serving as Plaintiff's regular coach. Dkt.263 at 240; Dkt.265 at 59. They had daily two-hour training sessions at USTA's Orlando campus on the clay courts, which are a softer surface

and gentler on players' bodies during training. Dkt.263 at 241, 244-45; Dkt.260 at 241; Dkt.264 at 74.

Plaintiff's practices were open to the public. Players' friends and family regularly visited the campus to watch practices. *See* Dkt.264 at 169. A family member with whom Plaintiff lived visited USTA's campus and observed one of Plaintiff's training sessions with Aranda. Dkt.263 at 73-74. Ola Malmqvist, who was USTA's Head of Women's Tennis from 2008 to October 2018 (when he was promoted to Director of Tennis/Coaching), spent much of his time roaming the courts at USTA's campus to monitor practices. Dkt.260 at 207, 245. Ordinarily, he spent three to six hours each day he was at the campus watching or assisting practices. *Id.* at 245-46. Because of how the courts are laid out, he could observe multiple courts at a time. *Id.* at 248. In October 2018, Kathy Rinaldi took over Malmqvist's position as Head of Women's Tennis. *Id.* at 250. Because Rinaldi was traveling in October and November, Malmqvist continued to monitor practices, and he had even more time to do so in his new role than previously. *Id.* at 250-51. Malmqvist had observed Aranda's coaching sessions in the past and never saw anything inappropriate. *Id.* at 251.

13

The Player Development program courts were specifically designed to be open and viewable from the nearby Player Development building, which features a large viewing area. Dkt.260 at 86; *see* Dkt.261 at 59-61. The program's twelve courts are all located together, in sets of three, next to that building. *See* Dkt.225-39 at 7. It was common for all the courts to be in use at a given time, with players and coaches working on each court, supervisors watching practices, mental performance trainers roaming the courts, and so on. Dkt.260 at 223-24. The Player Development courts also have a camera system called "PlaySight" that is used to record practices to evaluate and analyze players' technique. Dkt.261 at 37, 69.

### 3. Aranda Assaulted Plaintiff, and USTA Took Immediate Action.

Over approximately a two-week stretch, Plaintiff began to feel uncomfortable with Aranda. Aranda began making comments about Plaintiff's appearance. Dkt.263 at 245-46. He would touch her shoulder, arm, or thigh while reviewing video footage of their practices. *Id.* at 247-48. He told her that the PlaySight camera on the court was broken or not working, so he used his phone to record practices. *Id.* at 246-47. He would also touch her as she got up from the bench or during serving drills by standing close behind her with his hands on her hips. *Id.* at 248-49, 252.

14

Plaintiff was uncomfortable with Aranda touching her but did not initially suspect that he had inappropriate intentions, nor did she report any concerns to anyone. *Id.* at 248-49.

On November 9, 2018, Aranda assaulted Plaintiff. That day, Plaintiff spent the first thirty minutes of her session training with another player. Dkt.264 at 5. Malmqvist observed the start of their practice. *Id.* at 5-6. Plaintiff did not recall whether anyone other than Aranda was around after Malmqvist and the other player departed. *Id.* at 80-81. After the practice ended, Aranda sat on a bench on the court with Plaintiff and assaulted Plaintiff by moving his hand from her upper thigh to underneath the towel on her lap and rubbing her genital area over her pants for one to two seconds. *Id.* at 8, 82. Plaintiff immediately elbowed him away. *Id.* at 8. He knelt in front of her, massaged her calves, and asked "what [she] wanted him to be," to which she responded, "[j]ust my coach." *Id*. They walked to the indoor courts and Aranda made comments about Plaintiff's clothing, including offering to arrange discounts on clothing for her, then attempted to hug her. *Id.* at 9-10.

Plaintiff left the campus and went to Bellis's house. *Id.* at 10. She asked whether Aranda had ever touched Bellis, and Bellis said no.

*Id.* at 82-83. Plaintiff told Bellis about the assault, and Bellis immediately called Bellis's mother. *Id.* at 11. Bellis and her mother urged Plaintiff to report the assault to USTA. *Id.* at 11-12. Late that afternoon, Bellis and Plaintiff called Jessica Battaglia, a USTA employee with whom they were friendly from seeing each other on campus and volunteering, and reported the assault. *Id.* at 12-13; Dkt.262 at 122.

USTA took swift action. Battaglia told Bellis and Plaintiff that she (Battaglia) would need to report the assault. Dkt.262 at 123. She then immediately called several supervisors and reported the assault to the first supervisor she reached. *Id.* at 103-04. USTA conveyed Plaintiff's report to the Center for SafeSport that same day. Dkt.265 at 59. Also that same day, USTA removed Aranda's keycard access to the campus; suspended him with immediate effect; banned him from all USTA properties, programs, and tournaments; and instructed him not to contact any USTA athlete or employee other than his direct supervisor or the USTA employee responsible for contact with the Center. *Id.*; Dkt.260 at 87.

The next business day, USTA provided Aranda a letter reiterating his suspension and prohibition from entering the campus or contacting

players or staff. Dkt.265 at 59; *see* Dkt.225-8. USTA also arranged for Plaintiff to be escorted from her parking space to the tennis courts upon request, reserved parking spaces for her as close as possible to the courts, and showed campus staff a photo of Aranda so they could immediately contact law enforcement if he came on site. Dkt.260 at 90. USTA communicated those measures to Plaintiff through the relative with whom she was living, who was an attorney. *Id.* at 91. He responded that the protocols seemed "pretty thorough and well thought." Dkt.263 at 94.

Plaintiff chose to return to USTA's campus a few days later, on November 14. *Id.* at 94-95. She trained there for another fourteen or fifteen months, until the coronavirus pandemic. Dkt.260 at 167; Dkt.262 at 181.

### 4. The Center's Investigation Uncovered that Four Years Earlier, Aranda Had Touched a USTA Employee Inappropriately.

The Center's investigator interviewed Battaglia about Plaintiff's report. Dkt.262 at 108. When the investigator asked whether Battaglia had any additional information, Battaglia shared that in 2014, when she was at a nightclub with Aranda and other USTA employees, Aranda touched her inappropriately. *Id.*

As Battaglia recounted, when she was twenty-eight and Aranda was about thirty, *see* Dkt.226-2 at 2 (stating Aranda was thirty-four in 2018), the two went out drinking with a group late at night, Dkt.262 at 109, 113. While Battaglia was dancing, Aranda approached her and danced close behind her. *Id.* at 106. He then reached around her and rubbed her genital area over her clothes. *Id.* Battaglia left the nightclub and got in a cab with a friend. *Id.* at 107. She was embarrassed by the incident and chose to keep it private. *Id.* She was able to move on and never had another incident with Aranda, nor did she ever witness any subsequent behavior from Aranda that caused her concern. *Id.* at 112-13. Battaglia never reported the incident, and she testified that it never crossed her mind that Aranda's misconduct toward her at a nightclub in 2014 indicated that he would ever inappropriately touch an athlete he was coaching. *Id.* at 126.

At no time was Battaglia responsible for managing or supervising Aranda or any other coach. She began working for USTA in 2006 as an administrative assistant for coaching education and sports science. Dkt.265 at 60. In 2007, she became event planner/coordinator for coaching education and sports science, her position at the time of the

2014 nightclub incident. *Id.* In 2017, she changed positions to become manager of Player Development Events and Programming. *Id.* In that role, she was part of the team responsible for putting on continuing education programs for coaches. Dkt.262 at 84. The only person who reported to her was an administrative assistant. *Id.* at 120; Dkt.226-17.

### 5. The Center Suspended Aranda, and USTA Banned Him for Life.

After its investigation, the Center found that Aranda had made the inappropriate comments and physical contact that Plaintiff reported, including the assault on November 9, 2018. *See* Dkt.260 at 29, 36-37. The Center did not find any wrongdoing by USTA. *Id.* at 101. As part of the investigation, Tracy looked for camera footage of Plaintiff's practices with Aranda but found that the PlaySight camera from the relevant court was not turned on that day. *Id.* at 33. Because of Aranda's misconduct, the Center imposed a two-year suspension followed by a two-year period of probation. *Id.* at 95. USTA fired Aranda and banned him for life. *Id.*

## C.    Procedural Background

Plaintiff sued USTA in March 2022 for, as relevant here, negligent supervision/retention and negligence. Dkt.1; Dkt.34 at 13-18, 20-23.[1] After discovery, USTA moved for summary judgment. Dkt.96. Plaintiff moved for partial summary judgment with respect to her assertion that USTA owed her an affirmative duty of care to protect her from sexual assault by USTA coaches while she was training at USTA's campus. Dkt.98 at 3.

The district court denied USTA's motion and granted Plaintiff's motion in part. Dkt.164 at 32-33. Relevant here, the court held that, upon accepting her new position in 2017 as manager of Player Development Events and Programming, Battaglia became required by the Center's Code to report the 2014 nightclub incident involving Aranda. *Id.* at 15-16 & n.3. The court acknowledged that the Center's Senior Legal Counsel had submitted a declaration stating that the Code was never intended to be construed to require a victim to report his or her own abuse and that later versions explicitly reflect that "long-held belief" of the Center. *See*

---

[1] To USTA's knowledge, Plaintiff did not institute any legal proceedings against Aranda.

20

*id.* at 16; Dkt.97-8 ¶ 7. But the court decided that Battaglia "lost the option of keeping silent when she accepted" the position of manager of Player Development Events and Programming. Dkt.164 at 16 n.3. The court nonetheless held that whether the 2014 incident made Aranda's assault on Plaintiff in 2018 foreseeable and whether Battaglia's role was such that her knowledge of the 2014 incident was imputed to USTA were fact questions for the jury. *Id.* at 11-16.

At the final pretrial conference, the court granted Plaintiff's motion to exclude post-2018 versions of the SafeSport Code based on its summary-judgment ruling. Dkt.177 at 95-96, 103. The court reiterated its ruling that when Battaglia accepted her new position with USTA in 2017, she lost the right to keep the 2014 nightclub incident private. *Id.* at 96-98. The court harshly criticized Battaglia for not disclosing the 2014 incident at the time of her 2017 job change, stating that she "chose her own well-being over the well-being of somebody else" and that "what she did was absolutely unforgivable." *Id.* at 99. The court then went beyond its summary-judgment order by stating that Battaglia's knowledge of the 2014 incident had to be imputed to USTA as a matter of law and that it

21

would instruct the jury that "[t]he company knows what the employee knows." *Id.* at 99, 101.

At trial, after Plaintiff rested, the court denied USTA's motion for judgment as a matter of law on both claims. Dkt.264 at 134, 140. Although USTA had not yet finished presenting its case, the court indicated that it was considering granting judgment as a matter of law in favor of Plaintiff on elements of both claims. *Id.* at 140; *see also id.* at 142, 147-48. At the court's instruction, Plaintiff moved for a directed verdict. *Id.* at 150. The court began to rule on Plaintiff's motion—*see id.* at 152 ("Directed verdict is—")—but ultimately "reserve[d]" its ruling until the close of USTA's case, *id.* at 156.

After USTA rested, Plaintiff moved for judgment as a matter of law on all elements of both her claims except for causation and damages. Dkt.265 at 61, 72-73. The court granted that motion.

On the claim for negligent retention and supervision, the court ruled as a matter of law that USTA knew or reasonably should have known that Aranda was unfit to be a coach and that it was negligent for failing to act based on that knowledge. *Id.* at 86-87. The court reasoned that Battaglia's knowledge of the 2014 nightclub incident was imputed

22

to USTA because Battaglia was "very high up in the chain" at USTA, *id.* at 62, and that there was "really no difference" between the 2014 nightclub incident and Aranda's on-court assault on Plaintiff four years later, *id.* at 65.

On the negligence claim, the court ruled as a matter of law that USTA breached its duty of care to Plaintiff. *Id.* at 86. The court's conclusion was based on its determination that USTA did not follow its internal "rule of three" policy for Plaintiff's interactions with Aranda and did not have a video system to monitor all coach-athlete interactions in real time. *Id.* at 64, 79.

After being instructed by the court that USTA was negligent and "responsible" for "what happened," *id.* at 138-39, the jury awarded $3,000,000 in damages, Dkt.221. In the second phase of trial, the court denied USTA's motion for judgment as a matter of law on punitive damages, Dkt.265 at 212-13, and the jury awarded $6,000,000 in punitive damages, Dkt.222.

USTA timely filed a renewed motion for judgment as a matter of law on all claims or, alternatively, for a new trial or remittitur. Dkt.236. USTA argued that, given Battaglia's choice to keep the 2014 nightclub

incident private, there was no evidence from which a reasonable jury could find that USTA had notice that Aranda was unfit. *Id.* at 2-12. It also argued that there was no evidence to support Plaintiff's claim of negligence. *Id.* at 13-18. And it argued that there was insufficient evidence to support punitive damages. *Id.* at 18-24.

The court denied the motion. Dkt.247. It held that as a matter of law, Battaglia's knowledge of the 2014 nightclub incident was imputed to USTA for two reasons: The SafeSport Code required her to report the incident, and the incident was material to her job duties. *Id.* at 21-23. It held that this imputed knowledge, "coupled with" USTA's general awareness of instances of sexual abuse in amateur tennis, made Aranda's assault of Plaintiff foreseeable as a matter of law. *Id.* at 23-24. Regarding the negligence claim, the court once again held that USTA was negligent because it did not follow the rule of three for Plaintiff's interactions with Aranda and did not "monitor[] CCTV and record[] all coach-athlete interactions." *Id.* at 18. Finally, it held that punitive damages were justified, relying in large part on USTA's comments to the Olympic Committee regarding the Committee's proposed standards in 2012 and 2015. *Id.* at 28.

USTA timely appealed. Dkt.251.

## STANDARD OF REVIEW

This Court reviews de novo the district court's disposition of a motion for judgment as a matter of law, including on the issue of punitive damages. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1210 (11th Cir. 2010); *EEOC v. W&O, Inc.*, 213 F.3d 600, 610 (11th Cir. 2000). Judgment as a matter of law is proper only if, after the non-movant has been fully heard on an issue, no reasonable jury would have a legally sufficient evidentiary basis to find for the non-movant on that issue. Fed. R. Civ. P. 50(a). The court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

"[G]ranting judgment as a matter of law in favor of a party bearing the burden of proof" is "an 'extreme step' which 'can be done only when the evidence favoring the claimant is so one-sided as to be of overwhelming effect.'" *Handley*, 2023 WL 6628921, at *3 (quoting *Massey Yardley*, 117 F.3d at 1250); *see Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) (JMOL for party with burden of proof is

"rarely appropriate" and "reserved for … extreme circumstances" (quotation marks omitted)); 9B Wright & Miller, Federal Practice & Procedure § 2535 (3d ed.) ("[C]ourts often caution that granting a judgment as a matter of law for the party bearing the burden of proof is reserved for extreme cases.").

## SUMMARY OF ARGUMENT

USTA is entitled to judgment as a matter of law on both claims and on the issue of punitive damages. At minimum, USTA is entitled to a new trial on both claims.

I. On the claim for negligent supervision and retention, the district court erred in denying USTA's motion for judgment as a matter of law. To prevail on this claim, Plaintiff had to prove that USTA knew Aranda was unfit for his job. The undisputed evidence established that USTA had no actual or constructive knowledge of any prior misconduct by Aranda. Nor was there any valid basis to impute the knowledge of a USTA employee, Jessica Battaglia, about the 2014 nightclub incident to USTA. Battaglia had no authority over Aranda, and she had no obligation to report Aranda's misconduct toward her. At the very least, USTA was entitled to try this claim to the jury. First, to the extent the imputation

26

of Battaglia's knowledge turned on the scope of her job duties, there was at least a dispute of fact regarding those duties. Second, even assuming Battaglia's knowledge was imputed to USTA, a reasonable jury could still have found that USTA was not negligent because Aranda's assault of Plaintiff was not foreseeable.

II. On the negligence claim, the district court again erred in denying USTA's motion for judgment as a matter of law. The Center's Code established the standard of care, and unrebutted evidence established that USTA fully complied with the Code. At minimum, USTA was entitled to try this claim to the jury because reasonable jurors could have found in USTA's favor. The court's reasons for taking the issue from the jury—that USTA did not have constant video monitoring of coach-athlete interactions and did not follow the "rule of three" for Plaintiff—are unsupported by the evidence and are not valid legal bases for holding USTA negligent as a matter of law.

III. USTA is entitled to judgment as a matter of law on punitive damages. Florida law permits punitive damages only when the defendant's conduct rose to a level of gross negligence equivalent to that required for criminal manslaughter. Even assuming a jury could find

USTA negligent at all, no reasonable jury could find by clear and convincing evidence that USTA's conduct rose to that exceedingly high level. USTA complied with the Center's Code, established and followed internal policies and training exceeding that baseline, and responded to Aranda's assault of Plaintiff more aggressively than the Center. USTA's good-faith efforts to create a safe environment and root out sexual misconduct cannot, as a matter of law, give rise to punitive damages.

## ARGUMENT

### I.    USTA Is Entitled to Judgment as a Matter of Law or a New Trial on Plaintiff's Claim for Negligent Supervision and Retention.

The district court erred in denying USTA's motion for judgment as a matter of law and in granting judgment as a matter of law for Plaintiff on the claim for negligent retention and supervision. USTA was entitled to judgment on this claim because it had no actual or constructive knowledge of any prior misconduct by Aranda. At the very least, USTA was entitled to try this claim to the jury. Even assuming that USTA had imputed knowledge of the 2014 nightclub incident, a reasonable jury could still have found that USTA was not negligent.

**A.    USTA Did Not Know Aranda Was Unfit for His Job.**

To prevail on her claim for negligent supervision and retention, Plaintiff had to prove that USTA knew Aranda was unfit for the job of coaching adult athletes like Plaintiff. *Garcia v. Duffy*, 492 So. 2d 435, 441 (Fla. 2d DCA 1986). Plaintiff sought to establish this element by contending that Battaglia's knowledge of Aranda's actions toward her at a nightclub in 2014 was imputed to USTA. There was no evidence that anyone at USTA other than Battaglia had any knowledge of this misconduct by Aranda.

Under Florida law, knowledge of an employee or agent can be imputed to her principal or employer only if the knowledge falls "within the scope of her authority." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017); *see also Anderson v. Walthal*, 468 So. 2d 291, 294 (Fla. 1st DCA 1985). The district court held that Battaglia's knowledge fell within the scope of her authority for two reasons. First, the court stated that she was "[v]ery high up in the chain" and that her "responsibilities" included "placing coaches with athletes who are interested in becoming coaches in the future." Dkt.265 at 62. Second, the court found that Battaglia was required by the SafeSport Code in 2017

29

to report the 2014 incident. Dkt.247 at 22-23; *see also* Dkt.264 at 139 (finding that Battaglia had a "duty to share" her knowledge and decided "not to say anything for her selfish reasons"). Both of those findings lack evidentiary support.

**First**, Battaglia had no authority over Aranda. The record showed that in her role as manager of Player Development Events and Programming, Battaglia was responsible for projects and events—not people, and certainly not coaches. Dkt.262 at 120-21. The evidence was clear that Battaglia's duties did not involve overseeing coaches or pairing coaches with players for training. Battaglia's testimony that she had no authority over coaches in the Player Development program and no authority over Aranda in particular, *id.* at 121, was uncontroverted.

Based on a mistake about the record, the court justified imputing Battaglia's knowledge to USTA by stating that she was "[v]ery high up in the chain," Dkt.265 at 62, and that her "duties included pairing coaches with athletes interested in becoming coaches," Dkt.247 at 20. The record shows the opposite. Battaglia was not "high up in the chain": Only a single employee reported to her, and she did not even have authority to hire or fire that employee. Dkt.262 at 120. And when asked whether she

30

"pair[ed] coaches with athletes who were interested in becoming coaches," Battaglia stated without contradiction that she did not. *Id.* at 85. For its contrary finding, the court cited Plaintiff's Exhibit 32, which was not offered at trial and thus should not have been considered. Dkt.247 at 20; *see* Dkt.226 at 4; *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023) ("courts evaluate [JMOL] motions in light of the trial record rather than the discovery record"). In any event, that exhibit, a copy of Battaglia's employment history, provides no support for the court's statements. *See* Dkt.104-3.

The only evidence presented at trial regarding Battaglia's job duties was Battaglia's testimony and that of Martin Blackman, the general manager of USTA Player Development. Battaglia testified that she was involved with "logistics and planning" for a project in which coaches mentored athletes interested in becoming coaches, not that she actually paired coaches with athletes. Dkt.262 at 85. And Blackman, who was one step above Battaglia's direct supervisor, testified that Battaglia "[n]ever matched players to coaches. Dkt.265 at 53.

Moreover, there was no evidence to suggest that the coaching mentorship project for which Battaglia was an event planner had

31

anything to do with athletes training in the Player Development program. To the contrary, Blackman testified that none of the coaches in the coaching mentorship project were Player Development coaches. *Id.* There was thus no evidence that Battaglia's knowledge of the 2014 incident involving Aranda was material to her duties as manager of Player Development Events and Programming beginning in 2017. *Id.* at 60.

**Second**, the SafeSport Code did not require Battaglia to report her 2014 experience with Aranda to USTA, either at the time that incident occurred or three years later when she changed jobs. At the outset, the court erred by treating the Center's policy with respect to mandatory reporting as though it were binding federal law. *See* Dkt.177 at 97 (stating that Battaglia had a duty to report that was "set by law"); *id.* at 104 (stating that Center's understanding of its own policy was irrelevant because "outside authorities don't come in to tell the jury what the law is"); Dkt.247 at 22. Although Congress stated that whatever policies the Center developed would "apply as though they were incorporated in" the U.S. Code, 36 U.S.C. § 220541(b), as USTA pointed out, such incorporation would violate the private non-delegation doctrine, Dkt.264

32

at 225. Congress cannot delegate its legislative authority to a private group whose rulemaking is not subordinate to an agency. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935); *Consumers' Rsch. v. FCC*, 88 F.4th 917, 925-26 (11th Cir. 2023).

Regardless, the court erred by interpreting the Center's Code to require Battaglia to report the 2014 incident. For one thing, properly understood, the Code does not impose any obligation on a victim of sexual misconduct to report his or her own victimization. As Dr. Applewhite testified, it is a longstanding basic principle that "we don't require victims to report their own abuse." Dkt.264 at 279. Indeed, victims of sexual abuse have a constitutionally protected interest in maintaining the privacy of that information. *See Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998). As the court recognized in its summary judgment order, later versions of the Code clarified that a victim is not required to report her own victimization. Dkt.164 at 16; *see* Dkt.97-8 ¶ 7 ("Nothing in this Code shall be construed to require a victim of … misconduct to self-report." (quotation marks omitted)).

While the Code did not spell out that limitation at the time of Aranda's assault on Plaintiff, it did not have to: Everyone, including the

33

Center itself, understood that the Code would be read as incorporating this fundamental background principle. The 2018 Code stated that any "[q]uestions about whether conduct triggers a reporting obligation should be directed to the Office." Dkt.95-6 at PageID 1609 § II.A.2.b.[2] And the Center's Senior Legal Counsel submitted a declaration stating that "[a]t no point was the Code ever intended to be construed to require a victim to report his or her own abuse" and that later versions of the Code confirm that "long-held belief" of the Center. Dkt.97-8 ¶ 7. The court improperly barred USTA from presenting this evidence to the jury because it wrongly concluded as a matter of law that Battaglia was required to report the 2014 incident. Dkt.177 at 95-105.

The Code's reporting requirements additionally did not cover Battaglia because they apply to misconduct toward athletes and minors, not misconduct toward adult colleagues like Battaglia. The Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act made clear that the focus of the Act—and the Center—is preventing and reporting misconduct toward athletes and minors. *See, e.g.*, Pub. L. No. 115-126, § 101(a), 132 Stat. at 318 (mandating reporting of *child*

---

[2] References to PageID pages can be found in the ECF timestamp.

abuse); *id.* § 201(3), 132 Stat. at 320 (expanding Olympic Committee's purposes to include promoting a sports environment "free from abuse … of any amateur *athlete*" and establishing Center to "exercise jurisdiction … with regard to safeguarding amateur *athletes* against abuse … in sports" (emphasis added)). The Center's Code, issued pursuant to that authority, specifies that it does not replace an organization's employment practices. Dkt.95-6 at PageID 1596 § I.D.1.b.

Lauren Tracy, who oversaw USTA's SafePlay program, testified that she understood the Center's Code not to apply to interactions between employees. *See* Dkt.260 at 107. Battaglia likewise testified that from her trainings—which were provided by the Center—she understood the reporting requirements to apply to misconduct toward "athletes and minors," not fellow employees like herself. Dkt.262 at 92-94, 121-22. And Dr. Applewhite testified that because the Center's Code was "really designed to address and protect athletes and minors who are athletes," the Code was reasonably understood as not applying to the 2014 incident "because that was … a peer-to-peer employment situation." Dkt.264 at 264; *see also id.* at 265-66.

Finally, even assuming for argument's sake that the SafeSport Code required Battaglia to report the 2014 incident *to the Center*, there was no evidence that Battaglia had a duty to report it *to USTA*. Instead, the Code states that conduct "that could constitute sexual misconduct should be reported to the Office as set forth in the SafeSport Practices and Procedures." Dkt.95-6 at PageID 1604 § V.A.1 (emphasis omitted). The "Office" is "[t]he U.S. Center for SafeSport's Response and Resolution Office." *Id.* at PageID 1596. The SafeSport Practices and Procedures likewise state that "Covered Adults must report *to the Office*" conduct that could constitute sexual misconduct. *Id.* at PageID 1609 § 2.a.i (emphasis altered). This is fatal to Plaintiff's imputation theory because under Florida law, only the entity "to which [an agent] owes [a] duty" to communicate her knowledge "will be chargeable with [that] knowledge." *First Bond & Mortg. Co. v. Yancey*, 139 So. 597, 599 (Fla. 1932) (quotation marks omitted). Any duty Battaglia may have had to report the 2014 incident to the Center therefore does not support imputing her knowledge to USTA.

In short, because there is no valid basis, in law or in the trial record, to impute Battaglia's knowledge of the 2014 nightclub incident to USTA,

USTA is entitled to judgment as a matter of law on Plaintiff's negligent-supervision-and-retention claim.

### B. At Minimum, the Claim of Negligent Retention and Supervision Should Have Been Decided by the Jury.

Even if USTA were not entitled to judgment as a matter of law on the claim of negligent retention and supervision, it was entitled at the very least to have the jury decide that claim. First, insofar as the issue of whether Battaglia's knowledge of the 2014 nightclub incident should be imputed to USTA turns on the scope of Battaglia's authority and duties, that is a question of fact on which there was at least a genuine dispute. Second and independently, even if Battaglia's knowledge of the 2014 incident was properly imputed to USTA, a reasonable jury could still have found that the 2018 incident involving Plaintiff four years later was not foreseeable and that USTA therefore was not negligent in retaining Aranda after the nightclub incident.

*First*, an employee's duties and scope of employment are an issue of fact that must be reserved for the jury whenever there is a material dispute. *Whetzel v. Metro. Life Ins. Co.*, 266 So. 2d 89, 91-92 (Fla. 4th DCA 1972). Here, there was ample evidence—including testimony regarding Battaglia's and USTA's understanding of Battaglia's duties as a USTA

employee—from which a reasonable jury could have concluded that Battaglia's duties did not include supervising coaches like Aranda and that she had no obligation to report the 2014 incident to USTA. Under Florida law, an employee's knowledge is imputed to her employer only if the employee "in the line of [her] duty ought and could be reasonably expected to … communicate the knowledge to the" employer. *Dickson v. Graham-Jones Paper Co.*, 84 So. 2d 309, 310 (Fla. 1955) (quoting 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations, art. 793, at 30-32 (perm. ed. 1931)). Battaglia's and USTA's understandings are obviously relevant to whether Battaglia should have been reasonably expected to report the 2014 incident to USTA.

**Second**, even assuming that Battaglia's knowledge of the 2014 incident was properly imputed to USTA as a matter of law, the district court erred by taking away from the jury the further question of whether that imputed knowledge meant that USTA was negligent in allowing Aranda to coach Plaintiff. To prove negligent retention or supervision, Plaintiff had to prove that USTA knew Aranda was unfit for the job. *See M.V. ex rel. W.W. v. Gulf Ridge Council Boy Scouts of Am., Inc.*, 529 So. 2d 1248, 1248-49 (Fla. 2d DCA 1988). "The factors constituting …

38

employee fitness" will "vary with the circumstances of each case," and "the negligence of an employer's acts or omissions upon actual or constructive notice … will also be a question of fact." *Garcia*, 492 So. 2d at 441. Having some negative information about the employee is not enough; the employer must have knowledge making it foreseeable that the employee would engage in the specific type of conduct at issue. *Id.*; *see also Dickinson v. Gonzalez*, 839 So. 2d 709, 714 (Fla. 3d DCA 2003) (police officer's "serious[] … misconduct" in disciplinary record did not place employer on notice that officer "was not competent to properly determine probable cause in a roadside stop"); *Doe v. ATC, Inc.*, 624 S.E.2d 447, 451-52 (S.C. Ct. App. 2005) (affirming JMOL for defendant where "prior alleged misconduct by [plaintiff's assailant] against … a co-employee" was "a far cry from the reprehensible, persistent pattern of abuse against" plaintiff, even though "both incidents may generally be described as sexual in nature").

Because "[t]he core predicate for imposing liability is one of reasonable foreseeability," "the inquiry is focused on whether the *specific* danger that ultimately manifested itself … reasonably could have been foreseen" by the employer. *Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002)

39

(emphasis added). Here, a reasonable jury could have concluded that Aranda's groping of a colleague while dancing in a nightclub after a night of drinking, while clearly inappropriate, did not make it foreseeable that four years later he would abuse a player he was coaching.

The district court rejected any distinction between the 2014 incident and Aranda's 2018 assault of Plaintiff. *See* Dkt.265 at 65 ("There's really no difference."). But that was a classic jury question, and the court was not entitled to disregard the evidence that there were many salient differences between the two incidents. As Battaglia testified, the 2014 incident occurred while she, Aranda, and other colleagues were in a social setting, dancing at a nightclub, late at night, after drinking. Dkt.262 at 105-08, 113. She was twenty-eight at the time, while Aranda was approximately thirty. *Id.* at 109; Dkt.226-2 at 2. Dr. Applewhite testified that the context of the 2014 incident—a peer-to-peer situation rather than one involving a significant power differential—meant that the 2014 incident was not even the type of misconduct covered by the Center's Code, which underscores the significant differences between the 2014 incident and Aranda's abuse of Plaintiff as her coach four years later. Dkt.264 at 264; *see also* Dkt.95-6 at PageID 1601-02 § II.R.

(SafeSport Code's definition of power imbalance, in which parties' respective roles and ages are relevant considerations).

Battaglia herself testified repeatedly that she never imagined, based on the nightclub incident, that Aranda would harm a player: "The context of my situation and Ms. McKenzie's are entirely different." Dkt.262 at 129. Considering "[t]he incident that happened to [her] and the context in which it happened," Battaglia did "not in any way, shape, or form … think that that would translate to his behavior as a coach on court." *Id.*; *see also id.* at 126 (Question: "Based on your experience with Mr. Aranda in the nightclub in 2014, did it ever cross your mind that he would inappropriately touch an athlete he was coaching?" Answer: "No."). A reasonable jury could have agreed with Battaglia that the nightclub incident did not indicate that Aranda would behave inappropriately toward a player he was coaching in a professional setting. At minimum, the jury could have concluded that Battaglia's perspective was reasonable and not negligent.

To be clear, none of these factors excuses Aranda's behavior toward Battaglia. And had USTA known about that behavior, it might well have chosen to terminate or discipline Aranda even if it also could have

41

reasonably retained him. *Cf. Discount Tire Co. v. Bradford*, 373 So. 3d 399, 402 (Fla. 5th DCA 2023) (explaining that an organization is free to establish policies that go above and beyond what is reasonably prudent). Regardless, as a matter of law, these distinguishing factors are relevant to whether the 2014 incident made the 2018 incident foreseeable. *See, e.g.*, *Meyers v. Ramada Hotel Operating Co.*, 833 F.2d 1521, 1524 (11th Cir. 1987) (per curiam) (identifying the location of an incident, the presence of alcohol, the relationships of the parties involved, and the time of day as factors relevant to foreseeability); *Banosmoreno v. Walgreen Co.*, 299 F. App'x 912, 914-15 (11th Cir. 2008) (per curiam) (similar). The jury should have been permitted to evaluate this evidence and decide whether the 2014 nightclub incident made the 2018 assault foreseeable.

## II.   USTA Is Entitled to Judgment as a Matter of Law or a New Trial on Plaintiff's Negligence Claim.

To establish her claim for negligence, Plaintiff had the burden to prove that USTA failed to exercise reasonable care to protect Plaintiff. The evidence was clear that USTA did exercise reasonable care. At minimum, USTA was entitled to have a jury decide the issue.

### A. There Was Extensive Evidence that USTA Exercised Reasonable Care to Protect All Players in Its Training Program.

The district court held as a matter of law that USTA breached its duty of reasonable care. Dkt.265 at 86. Whether a defendant has acted reasonably depends on "the circumstances of [the] particular case[]." *Schulz v. Pa. R.R.*, 350 U.S. 523, 525 (1956).

It was undisputed at trial that the Center's Code set forth the relevant standard of care for these circumstances (*i.e.*, for an adult athlete participating in a sport under Olympic Committee jurisdiction). Dkt.264 at 211-14, 218-19. And the evidence showed that USTA fully complied with the Code. USTA conducted regular criminal background checks for all of its employees. Dkt.260 at 77-78. It required employees to complete annual training provided by the Center. *Id.* at 77.[3] It also went "above and beyond" by requiring two additional trainings in April and October 2018. Dkt.261 at 57-58; Dkt.265 at 52. The only expert witness

---

[3] The court stated that "there's been no testimony [that the training] was government issued." Dkt.265 at 84. In fact, multiple witnesses explained that the training is provided by the Center. *See, e.g.*, Dkt.260 at 77, 82; Dkt.262 at 89. What is more, the training certificates, many of which were admitted as exhibits, state "U.S. Center for SafeSport hereby recognizes [name] for the successful completion of [course]." *See* Dkt.225-17.

43

at trial testified that as of 2018, *everything* the Committee required was in place at USTA. Dkt.264 at 214. She also testified that USTA met every standard of care under Congress's SafeSport Act, which Plaintiff agreed was the applicable standard. *Id.* at 218-19. And she testified that USTA met every requirement under the Center's Code. *Id.* at 239-40.

Despite this clear commitment to player safety, the court held that USTA breached the standard of care as a matter of law for two reasons: It did not have continuous real-time video monitoring of all practices, and it did not apply the "rule of three" to adult players on open and observable tennis courts. *See* Dkt.247 at 17-18. Neither conclusion shows that USTA breached the relevant standard of care.

***First***, there was no testimony that the standard of care demanded constant video surveillance of open practices on outdoor courts. To start, the idea of continuous monitoring was introduced by the district judge, not by any witness. *See* Dkt.265 at 79 ("[S]imple fix. Put on video, CCTV. Monitor it. Have a person paid to monitor it—I know that's overhead— and they can watch in real time these coaches all the time, at least as best you can."). It is normal for coaches to record videos of practices to help evaluate a player's technique. Dkt.264 at 72-73. But there was no

evidence that it is a common practice to monitor every coach-athlete interaction in real time. Nor was there any evidence that it would have been reasonable (or even possible) for USTA to monitor CCTV "in real time … all the time" for all practices, as the court suggested. On the contrary, unrebutted expert testimony established that "having video surveillance is not a standard" of care in sports. *Id.* at 282. Expert testimony also established that simply *having* cameras, whether working or not, monitored or not, can provide a deterrent effect. *Id.* at 253-54, 281-82. Because there was no evidence that continuously monitoring cameras in real time for all practices was required by the standard of care, the court's belief that such continuous video monitoring would be desirable cannot support liability.

*__Second__*, USTA's internal "rule of three" policy does not define the standard of care here, and in any event, USTA complied with that policy.

Federal law required the Center to include in its policies "reasonable procedures to limit one-on-one interactions … between an amateur athlete who is a *minor* and an adult." 36 U.S.C. § 220542(a)(2)(F) (emphasis added). The Center accordingly issued *Minor* Athlete Abuse Prevention Policies to do just that. *See*, *e.g.*, U.S. Ctr. for

SafeSport, Minor Athlete Abuse Prevention Policies (Jan. 5, 2024). It was undisputed that those policies did not apply to Plaintiff, who was not a minor in November 2018.

Instead, Plaintiff argued that USTA had violated its own internal policy. In accord with federal law and the Center's Minor Athlete policy, USTA adopted an internal policy to limit one-on-one interactions between adults and minors.[4] Since 2017, USTA's policy has stated:

> The following are best practices for all Covered Individuals and Athletes and should be abided by to the greatest extent possible:
>
> a. Rule of Three
>
> Interaction with participants should be in an open and observable environment. Adults should strive to avoid being alone with a single child or teen where he or she cannot be observed by others. The 'Rule of Three' offers a reminder that a minimum of three persons (two adults and one teen or child; or one adult and two teens or children) should be present at all times during USTA events ….

Dkt.225-4 at 10.

The court insisted that the reference in USTA's policy to a "child or teen" must include a legal adult of nineteen. *See* Dkt.247 at 14 & n.8

---

[4] Indeed, USTA had recommended a similar policy years before the Center was even created. *See* Dkt.225-40 at 33 (recommended "Supervision" policies for "youth" programs).

(quotation marks omitted). But Dr. Applewhite, the only expert on standards of care in this area, testified that she understood the policy to apply to minors, Dkt.264 at 229, and that she had *never* known an organization to apply the rule of three to someone eighteen or older (even when, as here, the organization's policies used language such as "teen[]"), *id.* at 274-75.

USTA employees also *all* testified that they understood the USTA policy to apply only to athletes under eighteen. *See* Dkt.260 at 58-59, 257; Dkt.261 at 59; Dkt.262 at 17-18. This understanding is reasonable and consistent with the SafeSport Act, which, as noted above, requires policies to limit one-on-one interactions between adults and minors, but says nothing about limiting such interactions with adult teenagers. There was no evidence to support the court's context-free reading of USTA's policy.

But even if the court were right that USTA's internal policy departed from the SafeSport Code and widespread practice by applying the rule of three to adults, that policy would not define the standard of care. An organization's "internal policies and procedure[s] are admissible as some evidence of the appropriate standard of care." *Steinberg ex rel.*

47

*Steinberg v. Lomenick*, 531 So. 2d 199, 200 (Fla. 3d DCA 1988). But because an organization is free to establish policies that go above and beyond what is reasonably prudent, *see Discount Tire*, 373 So. 3d at 402, an internal rule does not *define* the standard of care, *Nesbitt v. Cmty. Health of S. Dade, Inc.*, 467 So. 2d 711, 714 (Fla. 3d DCA 1985). So evidence that an internal rule was not followed "is *not* evidence of negligence unless and until the jury finds—which … it is free not to do— that the internal rule represents the standard of care." *Steinberg*, 531 So. 2d at 201. Here, however, it was undisputed that the Center's Code—not USTA's internal policies—defined the standard of care. Dkt.264 at 211- 14, 218-19. So any finding that USTA failed to abide by its own internal policies cannot establish liability as a matter of law.[5]

Moreover, even if USTA's rule-of-three policy *had* applied to Plaintiff and *did* set the standard of care, USTA did not violate the policy because Plaintiff was "in an open and observable environment" when

---

[5] At the very least, the jury should have been entitled to weigh the evidence and decide the standard of care. *See Steinberg*, 531 So. 2d at 200-01 (trial court appropriately refused to give jury instruction that improperly suggested school's internal "Rules for Staff" "represent[ed] the standard of care" and thus gave "far more weight to the evidence than it deserve[d]").

Aranda assaulted her. Dkt.225-4 at 10. There was extensive evidence that the entire training campus was an open and observable environment, just as it was designed to be. Dkt.260 at 86; Dkt.264 at 229. The red clay courts on which Plaintiff trained were an observable, easily interruptible area. Dkt.264 at 168, 229. Other coaches, other players, supervisory personnel, maintenance crews, and players' family and friends were frequently present in the training area. *Id.* at 168-69; Dkt.260 at 223-24. The Director of Coaching and Heads of Men's and Women's Tennis spent most of their time observing practices. Dkt.261 at 68. They chose to observe practices on a non-scheduled basis rather than at predictable, known times because that promoted accountability. Dkt.262 at 31. Consistent with this evidence, Dr. Applewhite testified that during normal operating hours, any interactions taking place on the courts were easily "interruptible." Dkt.264 at 229.

Furthermore, on its face, USTA's rule-of-three policy describes a goal, not an absolute requirement, and contemplates that adherence will not always be practicable. USTA's policy explains that the rule of three and other "guidelines" are "best practices" that "should be abided by to the greatest extent possible." Dkt.225-4 at 9-10. Accordingly, Malmqvist,

who had been USTA's Head of Women's Tennis, testified that he was familiar with the guidance and that although it was not practicable to follow the rule of three "at all times," USTA tried to "follow [it] as much as possible." Dkt.260 at 222. Martin Blackman, the general manager of USTA Player Development, similarly testified that USTA strives to follow the rule-of-three principle whenever possible for under-18 players. Dkt.261 at 31, 59. The court therefore erred when it faulted USTA for not "comply[ing]" with the rule of three. Dkt.247 at 14. In fact, the evidence was that USTA *did* comply with that policy according to its terms by following that best practice to the extent possible.

## B.    At Minimum, the Jury Was Entitled to Determine Whether USTA Exercised Reasonable Care.

In light of USTA's commitment to following the Center's Code and implementing its own policies to protect athletes' safety, whether USTA exercised reasonable care was at least a question for the jury. *See Handley*, 2023 WL 6628921, at *3 ("[G]ranting judgment as a matter of law in favor of a party bearing the burden of proof" is "an 'extreme step' which 'can be done only when the evidence favoring the claimant is so one-sided as to be of overwhelming effect.'" (quoting *Massey Yardley*, 117 F.3d at 1250)). The record showed that USTA took seriously its

responsibility to take reasonable care to prevent sexual assault. It complied with every feature of the Center's Code. It took proactive steps to find and root out potential bad actors in the tennis community, even if those actors were not USTA employees. After Plaintiff reported her assault, USTA immediately conveyed that information to the Center and, after the Center's investigation, barred Aranda for life.

In denying USTA's post-trial motion, the district court relied on two findings to support its conclusion that USTA was negligent as a matter of law: that USTA did not "monitor[] CCTV and record[] all coach-athlete interactions" and did not follow the "Rule of Three" for Plaintiff. Dkt.247 at 14-18; *see also* Dkt.265 at 65 ("No rule of three, no video, no nothing. That's a breach of a duty."). These findings are not evidence of negligence for the reasons explained above. USTA therefore should have been granted judgment as a matter of law on this claim. At a bare minimum, USTA was entitled to have a jury decide whether it was negligent.

A reasonable jury could have concluded that it was not negligent for USTA not to have, in the words of the court, "a CCTV camera setup with … a bank of monitors like they have in hotels." Dkt.265 at 80. The sole evidence regarding the cameras USTA *did* have was that they were

51

intended to help players improve their technique, not for constant, real-time monitoring of every coach-player interaction. *See* Dkt.261 at 37, 69; Dkt.260 at 33-34. Dr. Applewhite also testified that the presence of cameras, monitored or not, working or not, can deter misconduct. Dkt.264 at 253-54; 281-82.[6] There was no evidence that any applicable standard of care required USTA to continuously record all practices or monitor cameras as a security measure. *Cf. Mizener v. Carnival Corp.*, 2006 WL 8430159, at *2 (S.D. Fla. June 16, 2006) (no duty to monitor camera for safety of passengers absent evidence that cruise ship operator encouraged passengers to rely on such monitoring); *Page v. Choice Hotels Int'l, Inc.*, 2005 WL 1106893, at *6 (W.D. Mich. Apr. 18, 2005) (where there was no evidence that hotel's camera system was intended to supervise hotel guests, hotel had no duty to continually monitor cameras to protect guests in pool area). Indeed, there was no evidence that continuous video monitoring was even *possible* here, much less that it was what every reasonable person would do in the circumstances.

---

[6] Even *Plaintiff's* expert, who did not testify at trial, testified during her deposition that the proper level of supervision for an adult is "[c]ertainly not constant" and USTA had "ample mechanisms" for supervision, including its "laudable" open environment. Dkt.97-4 at 31:16, 49:1-50:3.

In addition, even setting aside all the reasons the "rule of three" did not apply here, a reasonable jury could have found that it was not negligent for USTA to permit a coach to interact with an adult player on an outdoor tennis court without a third person present. Dr. Applewhite testified that "[m]ost organizations" are "required to serve minors who are athletes in a place that is easily interruptible or observable." Dkt.264 at 228-29. She also testified that the "whole facility" was "in the category of informal monitoring or interruptible" unless, for example, "it was 10:00 p.m." *Id.* at 229. In light of Dr. Applewhite's testimony about the standard of care and the extensive evidence about the observability of the courts and the frequent presence of others on, near, or with a view of the courts, a jury could have found that it was reasonable for USTA not to require a third person to attend Plaintiff's practices with Aranda.

## III. USTA Is Entitled to Judgment as a Matter of Law on Punitive Damages.

Under Florida law, the "required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter." *Valladares*, 197 So. 3d at 11. Punitive damages may be awarded against an employer for the conduct of an employee only if the employer, through its managing agents, "engaged in conduct that

53

constituted gross negligence," defined as conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(3)(c), (2)(b); *see Napleton's N. Palm Auto Park, Inc. v. Agosto*, 364 So. 3d 1103, 1106 (Fla. 4th DCA 2023). The plaintiff must prove entitlement to punitive damages "by clear and convincing evidence." Fla. Stat. § 768.725; *see Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1189 n.6 (11th Cir. 2006) (per curiam). Even assuming a jury could find USTA negligent at all (which USTA disputes), no reasonable jury could find by clear and convincing evidence that USTA was guilty of a level of gross negligence equivalent to that involved in criminal manslaughter.

The district court did not apply the "clear and convincing evidence" standard. *See generally* Dkt.247. Instead, it merely stated that the award of punitive damages was supported by "competent evidence." *Id.* at 28. "Clear and convincing evidence" is "evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue." Fla. Civ. Jury Instr. 503.1(b). The evidence came nowhere near establishing, "without

54

hesitation," that USTA's managing agents had engaged in conduct sufficiently culpable to warrant punitive damages under Florida law.

According to the court, "the evidence showed the USTA had a 'culture' of conscious indifference" to athletes' safety. Dkt.247 at 28. In fact, USTA's response when Plaintiff reported Aranda's assault proves that USTA takes athletes' safety extremely seriously. USTA immediately suspended Aranda and implemented measures that made Plaintiff feel comfortable returning to the campus for another fourteen-plus months of training (ended only by the coronavirus pandemic). Dkt.260 at 167.

To find the contrary, the court principally relied on USTA's responses to and legal markup of two of the Center's proposals—one made six years before Aranda assaulted Plaintiff and one three years before. The court's reliance on a few out-of-context phrases in USTA's feedback to the Olympic Committee and the Center to find that USTA was "open[ly] hostil[e]" to player safety and consciously indifferent "to the safety of the young women who trained at their campus," Dkt.247 at 28, is utterly without support.[7]

---

[7] The court also mentioned evidence that USTA's general counsel encouraged Pam Shriver, a former tennis player (under a different

In 2012, USTA wrote a letter to the Olympic Committee expressing surprise at the Committee's proposal to penalize organizations that failed to comply with the Committee's proposed safety standards. Dkt.226-9. USTA expressed that it was "fully supportive of the SafeSport initiative" and noted that it had "been developing and enforcing [its] own policies for many years." *Id.* at KM00182. USTA also observed that the national governing bodies had recommended that the Committee "create a set of best practices," which was why USTA was surprised that the Committee had instead mandated minimum "standards with significant penalties." *Id.* at KM00182-83. That statement gently questioning the Center's authority to impose penalties is hardly indicative of hostility or conscious indifference on USTA's part toward the safety of tennis players.

The 2015 comments similarly do not show any gross negligence. In 2015, USTA counsel provided comments on draft revised SafeSport policies. Dkt.226-9. Counsel's main comment to the Olympic Committee

---

organization) and a USTA Foundation board member, to be careful about discussing this case with Plaintiff's counsel. Dkt.262 at 56-60. While the court described this brief exchange as "the USTA's attempt to cover up Ms. McKenzie's sexual assault," that makes no sense: USTA reported the assault to the Center immediately upon learning of it and never tried to "cover" it "up." In any event, the court found that this evidence "was not offered as a basis for punitive damages." Dkt.247 at 29 & n.15.

related to the definition of a "member" to whom the policies applied, which no one contends evidences a culture of indifference. *Id.* at 1. USTA also commented on broad language in the proposed policy stating that "[c]onsent is not possible" whenever "one person in a relationship holds a superior position of power over the other." *Id.* at 16. USTA suggested that this broad statement was "not realistic in tennis" because at the highest levels of the sport, "MANY female players date their own or other coaches." *Id.* USTA also pointed out that the power imbalance in such a relationship "could go either way," as a "hugely successful player" might be considered more powerful than her coach. *Id.* USTA sought to engage with the Committee regarding how to account for this reality, asking "how can we address?" *Id.*

Importantly, USTA did *not* disagree with the rest of the proposed policy's definition of consent, including that consent "must always be freely informed and actively given" and "cannot be obtained from an individual who is incapable of giving consent" because of his or her age. *Id.* at 15. In other words, USTA's counsel recognized the imperative of protecting athletes from nonconsensual sexual conduct, but worried that equating *any* relationship between a coach and a player with sexual

assault was unrealistic. Counsel's comments—which suggested only that a coach-player romantic relationship in which both parties freely consent may not always be objectionable—have no relevance to Aranda's nonconsensual physical assault.

Nothing about USTA's responses to the Committee's proposals demonstrated "indifference" or "hostility," Dkt.247 at 28, to players' safety. USTA has had policies in place to protect players and to govern interactions between coaches and athletes since before the Center existed, as discussed above. And USTA implemented the Center's rule to define as sexual misconduct any "intimate relationship involving a person in a position of power where a power imbalance exists." Dkt.225-4 at 3; *see id.* at 19-20. USTA has never suggested that the existence of *consensual* romantic relationships between professional players and coaches has any bearing on how USTA and the Committee should respond to *nonconsensual* sexual conduct.

Florida case law confirms that nothing about USTA's conduct in this case evidenced indifference to player safety equivalent to the gross negligence required for a criminal manslaughter conviction. For example, a Florida court reversed a punitive damages award where a child "fell

through a plate glass window, causing severe cuts and lacerations," at the defendant's childcare center. *Gerber Children's Ctrs., Inc. v. Harris ex rel. Harris*, 484 So. 2d 91, 91 (Fla. 5th DCA 1986). There was evidence that management had been "warned … about the danger of the window and the necessity for extra-strength glass" but "chose to rely on barriers." *Id.* There were *no* barriers in front of the window at the time of the accident. *Id.* Yet the court of appeal held that the center's negligence was not so "flagrant and reckless" as to support punitive damages. *Id.* at 92.

Likewise, in *Bradenton Mall Associates v. Hill*, 508 So. 2d 538 (Fla. 2d DCA 1987) (per curiam), the court held that the plaintiff's allegations, which were far more damning than the evidence against USTA here, were insufficient to state a claim for punitive damages. The plaintiff alleged that while she was a business invitee at a shopping mall operated by the defendant, she was abducted and raped. *Id.* at 538-39. She also alleged that the defendant had "actual or constructive knowledge of prior similar criminal acts committed upon other invitees" and failed to provide "even remotely adequate" security. *Id.* The court of appeal held that although the plaintiff stated a claim for negligence, she could not recover punitive damages because she did not claim "that [defendants]

provided *no* security, only that the security that was present negligently failed … to recognize the danger posed by [the] attacker." *Id.* at 539.

And in *ADT LLC v. Safe Home Security Inc.*, 2022 WL 2805252 (S.D. Fla. May 18, 2022), the district court, applying Florida law, held that even internal emails between the defendant's executives acknowledging reports of fraudulent misconduct by an employee and the need to address that misconduct, plus evidence of *five* additional complaints about the same misconduct by the same employee after those internal emails, was not enough to meet the "high standard" for punitive damages against the company. *Id.* at *8; *see also, e.g.*, *Fla. Power & Light Co. v. Dominguez*, 295 So. 3d 1202, 1204-07 (Fla. 2d DCA 2019) (holding that alleged "see-nothing, know-nothing approach" "certainly" did not rise to level that could justify punitive damages); *Pinnacle Prop. Mgmt. Servs., LLC v. Forde*, 372 So. 3d 292, 296 (Fla. 4th DCA 2023) (holding that evidence that defendant may have been negligent in failing to repair broken security gate despite complaints did not justify punitive damages).

In each of these cases, even evidence or allegations that the defendant was aware of a specific risk at a specific location or of

60

misconduct by a specific employee was not enough to support punitive damages against the employer when that risk manifested or that employee committed additional misconduct. Plainly, then, evidence that USTA raised questions about certain aspects of proposed policies while *agreeing* with the policies' prohibition of nonconsensual sexual conduct—combined with USTA's undisputed compliance with the Center's Code and additional safety policies—comes nowhere near the high standard required to permit punitive damages under Florida law.

The other "competent evidence" the district court identified as supporting punitive damages was USTA's "failure to use CCTV to monitor coach-athlete interaction, the absence of systematic and mandatory supervision of coaches interacting with players, and the failure to implement the Rule of Three." Dkt.247 at 28-29. As explained above, there was expert testimony that USTA *met* the standard of care. There was no evidence that the standard of care required monitoring cameras, following a rigid schedule to oversee practices, or ensuring that a 19-year-old was always with at least one other person in addition to her coach. Indeed, as discussed above, the evidence was that even for *minors*, the standard of care required only an *interruptible* and *observable*

environment—not continuous monitoring. But even if these supposed failures could have supported a finding of simple negligence, they surely do not rise to the level of gross negligence comparable to criminal manslaughter, as the cases discussed above make clear.

The district court also misstated the evidence. Referring to the total number of allegations of sexual abuse by someone involved in tennis of which USTA became aware between 2013 and mid-2018, the court stated that USTA "had direct reports of 27 sexual assaults by coaches" before Plaintiff was assaulted. *Id.* at 29. In fact, *none* of the incidents involved a USTA employee. Dkt.260 at 102-03. There is no evidence as to how many of those incidents, if any, involved coaches. And the incidents were not all "direct reports" to USTA; instead, USTA *proactively searched for* news of possible sexual misconduct by anyone in the sport. *Id.* at 71, 96, 102. Every time USTA became aware of a report, complaint, or allegation of sexual abuse, it took appropriate measures to investigate the matter, refer it to law enforcement, or refer it to the Center. Dkt.226-12 at 3.

No entity can absolutely guarantee that its employees will never engage in misconduct. As Dr. Applewhite testified, an organization can "do everything right and bad things [can still] happen." Dkt.264 at 206.

That is precisely what happened here. The evidence shows that USTA went above and beyond the standard of care. If USTA was negligent at all, it certainly was not so grossly negligent as to warrant punitive damages.

## CONCLUSION

This Court should reverse the district court's judgment and direct the entry of judgment in favor of USTA on both of Plaintiff's claims. In the alternative, the Court should vacate the judgment, order a new trial on liability and compensatory damages, and direct the entry of judgment in favor of USTA on Plaintiff's request for punitive damages.

Respectfully submitted,

*s/Jeffrey S. Bucholtz*

| | |
|---|---|
| Kevin W. Shaughnessy | Jeffrey S. Bucholtz |
| Meagan L. Martin | Paul Alessio Mezzina |
| BAKER & HOSTETLER LLP | Amy R. Upshaw |
| 200 S. Orange Avenue | E. Caroline Freeman |
| Suite 2300 | KING & SPALDING LLP |
| Orlando, FL 32801 | 1700 Pennsylvania Avenue NW |
| (407) 649-4000 | Washington, DC 20006 |
| | (202) 737-050 |
| | jbucholtz@kslaw.com |

*Counsel for Appellants*

December 18, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,842 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: December 18, 2024

*s/Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*s/Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Appellants*