**No. 24-12966**

_____

# IN THE UNITED STATES COURT
# OF APPEALS FOR THE ELEVENTH
# CIRCUIT

_____

KYLIE MCKENZIE,

*Plaintiff-Appellee,*

v.

UNITED STATES TENNIS ASSOCIATION INCORPORATED;
USTA PLAYER DEVELOPMENT INCORPORATED,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Middle District of Florida

No. 6:22-cv-00615-PGB-LHP

_____

## APPELLEE'S ANSWER BRIEF

_____

Amy L. Judkins
NEWSOME MELTON
201 S. Orange Ave
Suite 1500
Orlando, FL 32801
(407) 648-5977
ajudkins@newsomelaw.com
lusardi@newsomelaw.com

*Counsel for Plaintiff-Appellee*

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1.  Ackerbaum Cox, Joyce, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

2.  Allard, Robert, counsel for Plaintiff-Appellee Kylie McKenzie;

3.  Arch Capital Group Ltd. [ACGL], parent company of Arch Insurance North America;

4.  Arch Insurance North America, insurance carrier (as successor in interest to Allianz Global Corporate & Specialty SE) for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

5.  Baker & Hostetler LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

6.  Boskovich, Mark J., counsel for Plaintiff-Appellee Kylie McKenzie;

7.     Byron, Hon. Paul G., U.S. District Court Judge;

8.     Bucholtz, Jeffrey S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

9.     Cerri, Boskovich & Allard, LLP, counsel for Plaintiff-Appellee Kylie McKenzie;

10.     Freeman, E. Caroline, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

11.     Hoffman Price, Hon. Leslie, U.S. Magistrate Judge;

12.     Judkins, Amy L., counsel for Plaintiff-Appellee Kylie McKenzie;

13.     King & Spalding LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

14.     Luka, Maegen Peek, counsel for Plaintiff-Appellee Kylie McKenzie;

15.     Martin, Meagan L., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

*Kylie McKenzie v. United States Tennis Association Incorporated, et al.*

16.  McKeever & Seidule, counsel for Plaintiff-Appellee Kylie McKenzie;

17.  McKenzie, Kylie, Plaintiff-Appellee;

18.  Mezzina, Paul Alessio, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

19.  Newsome Melton, P.A., counsel for Plaintiff-Appellee Kylie McKenzie;

20.  Normand, Edmund A., counsel for Plaintiff-Appellee Kylie McKenzie;

21.  Normand Law, PLLC, counsel for Plaintiff-Appellee Kylie McKenzie;

22.  Sales, Erin M., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

23.  Seidule, Nicholas D., counsel for Plaintiff-Appellee Kylie McKenzie;

24.  Shaughnessy, Kevin W., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

25.     Soles, Maureen B., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

26.     United States Tennis Association Incorporated, Defendant-Appellant;

27.     Upshaw, Amy R., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated;

28.     USTA Player Development Incorporated, Defendant-Appellant;

29.     Weber, William S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated.

30.     Appellee, Kylie McKenzie, is an individual.

Dated: March 24, 2025

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................C-1

TABLE OF CONTENTS ..........................................................................i

TABLE OF CITATIONS ........................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ..................................... viii

STATEMENT OF THE CASE ..................................................................1

   A.    Statement of Facts ................................................................ 2

   B.    Course of Proceeding ......................................................... 10

   C.    Standard of Review ........................................................... 11

SUMMARY OF THE ARGUMENTS ........................................................13

ARGUMENT .......................................................................................16

   I.    Plaintiffs' Motion for Judgment as a Matter of Law ........................16

      A.   Negligence Claim..................................................................16

         1.   The court did not err in granting judgment on the duty element. ........................................................................16

         2.   The court did not err in granting judgment on the issue of breach. ........................................................................ 20

      B.   Negligent Retention and Supervision ..................................... 29

         1.   The district court did not err in imputing knowledge to the USTA. ................................................................... 29

         2.   The district court did not err in ruling on foreseeability as it relates to duty. ............................................................ 42

   II.   The USTA's Motion for Judgment as a Matter of Law ................... 46

      A.   Negligence ................................................................ 46

      B.   Negligent Retention and Supervision ..................................... 46

C. Punitive Damages ...................................................................... 47

    1. The jury was instructed on the correct standard for punitive damages. ............................................................ 47

    2. The evidence was sufficient to support the jury's finding that punitive damages were warranted. ................. 49

CONCLUSION ............................................................................ 56

CERTIFICATE OF COMPLIANCE .............................................. 57

CERTIFICATE OF SERVICE ........................................................ 58

# TABLE OF CITATIONS

**Cases**

*Anderson v. Walthal,*
    468 So. 2d 291, 294 (Fla. 1st DCA 1985). ...........................................31

*Artistic Ent. v. City of Warner Robins,*
    331 F.3d 1196, 1206 (11th Cir. 2003). .................................................. 33

*Atl. Coast Line R. v. Wauchula Mfg. & Timber,*
    64 So. 356, 357 (Fla. 1914) ................................................................. 28

*Barrientos v. CoreCivic,*
    951 F.3d 1269, 1276 (11th Cir. 2020). ......................................... 33, 35

*Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) ...................................... 39

*Bric Mcmann Indus. v. Regatta Beach Club Condo.,*
    378 So. 3d 652, 655 (Fla. Dist. Ct. App. 2023) ...................................48

*Burkhart v. Washington Metro. Area Transit Auth.,*
    112 F.3d 1207, 1213 (D.C. Cir. 1997). .............................................. 25

*Clay Elec. Coop, v. Johnson,*
    875 So. 2d 1182, 1185 (Fla. 2003). ......................................................16

*Dickinson v. Gonzalez,*
    839 So. 2d 709, 713 (Fla. 3d DCA 2003) ........................................... 43

*Dye v. Tamko Bldg. Prods.,*
    908 F.3d 675, 685 (11th Cir. 2018) ........................................ 29, 30, 41

*First Bond & Mortg. v. Yancey,*
    139 So. 597, 599 (Fla. 1932) ...............................................................31

*Fleetwood Homes of Fla. v. Reeves,*
    833 So. 2d 857, 867 (Fla. 2d DCA 2002)............................................. 48

*Garcia v. Duffy,*
    492 So. 2d 435, 441 (Fla. 2d DCA 1986)................................. 29, 43, 44

*Geneva Cty. Bd. of Educ. v. CAN Ins.,*
    87 F.2d 1491 (11th Cir. 1989) ......................................................... 12, 16

*Gutter v. E.I. Dupont De Nemours,*
    124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000). .................................... 38

*Harrison v. Tallahassee Furniture,*
    529 So.2d 790 (Fla. 1st DCA 1988)..................................................... 29

*Hinckley v. Palm Beach Cnty. Bd. of Cnty. Comm'rs,*
    801 So. 2d 193, 196 (Fla. 4th DCA 2001)............................................ 24

*Jacksonville, T. & K.W. Ry. v. Peninsular Land,*
    9 So. 661, 686 (Fla. 1891).................................................................... 31

*Kellner v. NCL (Bahamas),*
    753 F. App'x 662, 665 (11th Cir. 2018) ............................................... 17

*Knight v Merhige,*
    133 So.3d 1140, 1145 (Fla. 4th DCA 2014)........................................... 19

*LanChile Airlines v. Conn. Gen. Life Ins.,*
    759 F. Supp. 811, 814 (S.D. Fla. 1991)................................................ 30

*Limones v. School District of Lee County,*
    161 So. 3d 384 (Fla. 2015)............................................................. 19, 23

*Malicki v. Doe,*
    814 So. 2d 347, 362 (Fla. 2002)......................................................... 43

*Mallory v. O'Neil,*
　　69 So. 2d 313, 315 (Fla. 1954) ............................................................ 29

*McCain v. Fla. Power Corp.,*
　　593 So 2d 500, 502 (Fla. 1992).................................................... 17, 43

*McGinnis v. Am. Home Mortg. Servicing, Inc.,*
　　817 F.3d 1241, 1254 (11th Cir. 2016) .................................................. 11

*Michael & Philip, v. Sierra,*
　　776 So.2d 294, 297 (Fla. 4th DCA 2000) ............................................ 18

*Moss v. Am. Priv. Equity, LLC,*
　　No. 19-14777, 2021 WL 4848138, at *1 (11th Cir. Oct. 18, 2021) ....... 45

*Myers v. Cent. Fla. Invs.,*
　　592 F.3d 1201, 1215 (11th Cir. 2010)................................................... 50

*Nova Southeastern Univ. v. Gross,*
　　758 So. 2d 86, (Fla. 2000) .................................................................... 19

*Ondrisek v. Hoffman,*
　　698 F.3d 1020, 1026-27 (8th Cir. 2012)................................................ 12

*Palmer v. Shearson Lehman Hutton,*
　　622 So. 2d 1085, 1089 (Fla. 1st DCA 1993) ........................................ 18

*Pollock v. Fla. Dept. of Highway Patrol,*
　　882 So. 2d 928, 936–37 (Fla. 2004) ..................................................... 27

*Reeves v. Sanderson Plumbing Prods.,*
　　530 U.S. 133, 149 (2000) ............................................... 11, 20, 21, 28

*Rupp v. Bryant*,
   417 So. 2d 658, 668, n.27 (Fla. 1982) ........................................... 13, 20

*Santiago v. Sanders*,
   No. 15-13452, 2017 WL 11684722, at *2 (11th Cir. Aug. 8, 2017)........21

*Sapuppo v. Allstate Floridian Ins.*,
   739 F.3d 678, 679 (11th Cir. 2014)......................................................17

*Saunders v. Baseball Factory*,
   361 So. 3d 365, 370 (Fla. 4th DCA 2023) ......................................... 18

*Middlebrooks v. Hillcrest Foods*,
   256 F.3d 1241, 1246 (11th Cir. 2001) .................................................. 34

*St. Luke's Cataract & Laser Inst. v. Sanderson*,
   573 F.3d 1186, 1203 (11th Cir. 2009)...................................................12

*Symons Corp. v. Tartan-Lavers Delray Beach*,
   456 So. 2d 1254, 1257 (Fla. 4th DCA 1984) ........................................41

*Termilus v. Marksman Sec. Corp.*,
   No. 15-61758-CIV, 2016 WL 6212990, at *11 (S.D. Fla. June 27, 2016)
   ...................................................................................................... 55

*Valladares v. Bank of Am.*,
   197 So. 3d 1, 11 (Fla. 2016) ................................................................ 47

*Williams v. Davis*,
   974 So. 2d 1052, 1057, n.2 (Fla. 2007). .............................................. 20

**Statutes**

36 U.S.C. § 220541(a)(1)(C) ......................................................... 32

**Other Authorities**

Fla. Civ. Jury Instr. 503.1 ................................................................. 48

**Rules**

Federal Rule of Civil Procedure 50 .................................................. 11

**Treatises**

Restatement (Third) Of Agency § 5.03 (2006) ............................... 29

Restatement (Third) of Torts, § 40. ............................................... 17

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellee Kylie McKenzie ("McKenzie") does not object to the request by Defendants-Appellant for oral argument. McKenzie's counsel is happy to provide oral argument for why this Court should easily affirm the district court's entry of judgment on the jury's verdict in this negligence case governed by Florida's common law.

## STATEMENT OF THE CASE

This is a negligence case involving a heightened duty of care. Defendants/Appellant, the United States Tennis Association, Inc. and the USTA Player Development Inc., (together, the "USTA"), recruited Plaintiff/Appellee Kylie McKenzie ("McKenzie") at the age of twelve to move across the country, away from her family, to live and train under the prestigious auspices of the USTA's Player Development ("PD") program, where she lived, with some interruptions, through the age of nineteen. At nineteen, McKenzie was sexually groomed, harassed, and assaulted by her USTA coach while on USTA property.

McKenzie sued the USTA for negligence and negligent retention and supervision and sought punitive damages. After denying the USTA's motion judgment as a matter of law on all counts, the district court granted McKenzie's motion for judgment as a matter of law on the breach element of negligence, and on the notice and breach elements of negligent retention and supervision. The jury deliberated on the issues of causation and damages for both negligence counts and returned a verdict in favor of McKenzie. After the second phase of trial, the jury found the USTA's conduct warranted the imposition of punitive damages.

The USTA now appeals the district court's denial of its motion for judgment as a matter of law and, alternatively, the court's grant of McKenzie's partial motion for judgment as a matter of law.

## A. Statement of Facts

The United States Olympic and Paralympic Committee ("USOC") is a federally chartered entity whose central function is to coordinate sports throughout the United States. (Doc. 265, pp. 56-57). Pursuant to its authority, the USOC certifies a single national governing body ("NGB") for each Olympic sport. (*Id.*). The USTA is the NGB of tennis. (Doc. 260, 22:8-22); (Doc. 265, p. 57). As the NGB, the USTA is responsible for developing the sport, establishing goals, policies, and procedures, setting the rules of play, developing talent, and sanctioning tournaments. (Doc. 260, p. 23, 38). One of the USTA's most important roles is to safeguard athletes from abuse. (Doc. 260, 25:3–20; 108:1–13).

As part of its talent development mission, the USTA created the PD program, which expends considerable resources developing the most talented athletes in our country. (Doc. 260, p. 23); (Doc. 261, p. 31). Athletes invited into the PD program receive funding and opportunities to train with USTA coaches on USTA campuses. (*Id.*). Junior athletes are selected by the

USTA at a young age based on their age, ranking, and results. (Doc. 261, p. 33).

Plaintiff/Appellee Kyle McKenzie ("McKenzie") was a top junior athlete recruited by the USTA to participate in its prestigious PD program. (Doc. 260, p. 120); (Doc. 263, p. 219). From the ages twelve through nineteen, with some interruptions, McKenzie trained with the USTA's PD Program. Much of that time was spent away from her home in Arizona and away from her family. (Doc. 260, pp. 120-57). McKenzie lived in USTA dorms, with other families involved in the USTA, or in apartments paid for by USTA. (Doc. 263, p. 230); (Doc. 260, pp. 128-30). McKenzie and her family made these sacrifices because USTA was an elite program and the best opportunity to develop talent in the United States, (Doc. 260, p. 166), and because it had been Kylie McKenzie's dream since she was a young child to become a top tennis professional player. (Doc. 263, p. 87; p. 220). The USTA "seemed like a pathway for [McKenzie] to achieve [her] dream." (Doc. 263, p. 220).

McKenzie performed well as a junior athlete within the USTA. At fifteen, she won first place in a national tournament, making her one of the best junior athletes in the country. (Doc. 260, pp. 139-40); (Doc. 263, p. 227). At sixteen, she won an international junior tournament known as the Eddie

Herr, distinguishing her as one of the best junior athletes in the world. (Doc. 260, p. 148); (Doc. 262, p. 140); (Doc. 263, p. 229).

After recovering from a shoulder injury, at nineteen, McKenzie was invited to train at USTA's newly opened National Campus in Florida. In this age group, fewer players are sponsored by the USTA, making it even more competitive. (Doc. 260, p. 242); (Doc. 263, p. 222). While at the National Campus, McKenzie was assigned to USTA coach Anibal Aranda ("Aranda"). (Doc. 263, pp. 239-40).

Part of the USTA's National Campus is specifically reserved for PD program players. (*Id.*, p. 241). The PD courts comprise a row of hard courts and a row of clay courts, with the clay courts being the furthest away from the building and public areas of the campus. (*Id.*, p. 242). Each court is surrounded by chain-link fences, and each fence is covered in black cloth that reduces visibility. (*Id.*, p. 242).[1]

Aranda reserved courts for McKenzie's practices through USTA's court reservation system. (Doc. 225-11). Aranda scheduled McKenzie's training sessions to start at 11:00 am on the clay courts. (Doc. 262, p. 22-26); (Doc. 263, p. 243). On each day Aranda reserved clay courts for McKenzie, the surrounding courts were not reserved for the second hour of her training

---

[1] A visual of the courts and fencing can be seen on the site video included as Joint Exhibit 16. (Doc. 225-36).

sessions, and on some days, she was the only player training on the clay courts for the entire training session. (Doc. 262, pp. 22-26). These reservations were viewable by the USTA and its staff and coaches. (*Id.*, p. 23).

While training with McKenzie, Aranda's behavior became increasingly inappropriate and sexual in nature. (Doc. 263, pp. 245-54). This escalating pattern of behavior cumulated when he reached under her skirt while sitting next to her on a bench after practice and rubbed her vagina over her clothes. (Doc. 264, pp. 4-8).

McKenzie reported what happened to her to another player, CiCi Bellis ("Bellis"). (Doc. 264, 10:13-11:6). Bellis encouraged her to make a report to the USTA, and together the girls called USTA manager, Jessica Battaglia ("Battaglia"), and told her what happened. (Doc. 262, 99:8-15). The USTA then reported the incident to the U.S. Center for SafeSport (the "Center"). (Doc. 260, 25:21-26:2); (Doc. 226-1).

The Center was created by Congress in 2017 and was tasked with investigating sexual misconduct in sport. (Doc. 265, p. 57). As part of its federal authority, the Center promulgates rules for the protection of athletes called the Safe Sport Code (the "Code"). (*Id.*). The USTA has its own set of rules aimed at protecting players called the USTA Safe Play Policies. (Doc,

265, p. 57); (Doc. 260, pp. 56-57); (Doc. 225-4). Since 2017, the USTA's Safe Play Policies have incorporated the entire Code. (Doc. 260, p. 60); (Doc. 265, p. 58).

The Code includes provisions for mandatory reporting of sexual misconduct. (Doc. 225-6, p. 16). The mandatory reporting requirement included in the Code mirrors requirements in place by the USTA. (Doc. 260, 209:7–24). Both the USTA and the Center had provisions for anonymous reporting. (Doc. 225-4); (Doc. 225-6, p. 16); (Doc. 264, 234:7–17). All USTA employees are mandatory reporters and are required to report any conduct that could constitute sexual misconduct.  (Doc. 225-4); (Doc. 225-6, p. 16); (Doc. 264, 234:7–17); (Doc. 261, 27:3-13); (Doc. 260, 209:7–24).

The Center investigated McKenzie's allegations and found, by a preponderance of the evidence, that Aranda engaged in "an escalation of inappropriate conduct towards [McKenzie]" that "violated the Code's prohibition of sexual conduct where there is a power imbalance, regardless of purported consent." (Doc., 226-2). The Center found that Aranda's contact was perpetrated in a sexual manner and amounted to "a repeated and severe course of harassing conduct which offended and degraded [McKenzie] and caused a hostile environment." (*Id.*). The Center also found that Battaglia— the manager that McKenzie reported her assault to—had previously been

sexually harassed and assaulted by Aranda in a similar manner in 2014. (Doc. 262, pp. 105-07).

The USTA was aware of the risk of sexual misconduct in the coaching space for many years before Aranda's sexual assault of McKenzie. In 2012, the USOC provided the USTA with a handbook that provided minimum standards for the protection of athletes. (Doc. 226-8); (Doc. 260, p. 43). The USOC warned that sport was a high-risk environment for misconduct, which the USTA admitted was true. (Doc. 260, pp. 43-44); (Doc. 226-8, p. 5). The USOC recommended a ban on sexual contact within the coaching relationship due to the imbalance of power between coach and athlete. (*Id.*, p. 24).

For years, the USTA resisted implementing policies recommended by the USOC. (Doc. 226-9); (Doc. 260, pp. 48-49). Specifically related to a complete ban on sexual contact between athletes and coaches, the USTA wrote to the USOC that such a ban "is not realistic in tennis" because "many female players date their own or other coaches." (Doc. 226-10, p. 16); (Doc. 260, p. 54).

In the years preceding McKenzie's assault, the prevalence of sexual misconduct in sport led Congress to investigate what it called "a pervasive and systemic problem" of "sexual misconduct" in sport. (Doc. 226-11); (Doc.

260, p. 64). In response, the USTA documented 27 reports of sexual misconduct within its governance from the prior five years. (Doc. 260, p. 65); (Doc. 226-12).

Despite its well-documented knowledge of the dangers associated with coaching, the USTA did not supervise McKenzie's practices with Aranda. (Doc. 262, p. 17, 26); (Doc. 260, p. 222); (Doc. 260, p. 33). The USTA was informed in advance that Aranda planned to practice with McKenzie at times when the surrounding courts would be empty and took no action to protect or supervise McKenzie. (Doc. 225-11). Aranda's direct supervisor was out of the country the entire time Aranda was practicing with McKenzie and did nothing to ensure that he would be supervised when coaching McKenzie. (Doc. 261, 8:9-9:15, 12:14-17). Although the tennis courts are equipped with video cameras, the USTA failed to ensure that the cameras were turned on during McKenzie's practices. (Doc. 261, p. 37); (Doc. 260, p. 227); (Doc. 261, p. 37, 69); (Doc. 260, p. 33).

After reporting her assault, McKenzie was contacted by USTA's Director of Tennis, who told McKenzie not to tell anyone what happened to her. (Doc. 264, 17:4-16). This conversation, coupled with the pressure to maintain her position in the competitive PD Program, pushed her to return to the game. (*Id.*, 17:17-24). Soon after, McKenzie started experiencing

extreme panic attacks triggered by the thing she used to love the most—tennis. (*Id*., 32:9-36-1). McKenzie's mental health deteriorated over the next several months, and her tennis game suffered significantly. (*Id*., 41:23-42:7). Her once friend and confidant—Bellis—suddenly and without explanation ceased all contact with her. (*Id*., 29:1-20). This happened soon after Bellis had a meeting with Martin Blackman ("Blackman"), USTA's General Manager, about McKenzie's incident with Aranda. McKenzie was not invited to this meeting. (*Id*., 30:7-18). With her game deteriorating, the USTA eventually pulled her from the PD program. (*Id*., 42:8-23).

The jury heard testimony from numerous family members of McKenzie who testified about the profound impact these events had on Kylie's life. (Doc. 260, 162:2-163:6); (Doc. 263, 86:19-90:6); (Doc. 262, 147:24-150:25, 161:6-167:1); (Doc. 263, 181:21-188:15). Two medical professionals testified that Kylie suffered from PTSD and suicidal ideations stemming from the sexual misconduct she experienced and her treatment from the USTA. (Doc. 263, 22:25-40:8); (Doc. 263, p. 105); (Doc. 263, 181:21-188:15); (Doc. 264, 51:18-52:8). The medical testimony was uncontroverted and consistent: the emotional and mental injuries she suffered were substantial, long lasting, and are expected to impact her life and her relationships into the future.

## B. Course of Proceeding

McKenzie sued the USTA for negligence, negligent retention/supervision, and for punitive damages. (Doc. 34). [2] Prior to trial, McKenzie moved for partial summary judgment on the duty element of the negligence claim, asking the Court to apply Florida's "special relationship" law and hold that the USTA had an affirmative duty to supervise and protect McKenzie from sexual misconduct. (Doc. 98). The district court granted the motion, holding that the USTA owed McKenzie a duty of care to "protect players in its training program from sexual assault." (Doc. 164, p. 25).

Trial was held in two phases, with punitive damages evidence reserved for the second phase. (Doc. 183). At the close of McKenzie's case in the first phase, the USTA moved for judgment as a matter of law on both claims, which was denied. (Doc. 265, 212:20-213:6). At the conclusion of the USTA's case, McKenzie moved for judgment as a matter of law on all elements of the negligence claims except for causation and damages. (*Id.*, p. 71). The court granted McKenzie's motion. (*Id.*, p. 86).

After deliberations in the first phase, the jury found that the USTA's negligence was the legal cause of McKenzie's loss, injury, or damage, and that the USTA's retention and failure to supervise Aranda was the legal cause of

---

[2] McKenzie abandoned claims based on vicarious liability prior to trial. (Doc. 201).

McKenzie's loss, injury, or damage. The jury awarded McKenzie $3 million in compensatory damages. (Doc. 221).

After deliberations in the second phase, the jury found that the USTA engaged in conduct that warranted an award of punitive damages and awarded an additional $6 million in punitive damages. (Doc. 222).

The USTA renewed its motion for judgment as a matter of law after the close of trial, which was denied. (Doc. 247). This appeal followed.

## C. Standard of Review

The USTA limited this appeal to the district court's orders on motions for judgment as a matter of law ("JMOL") brought under Federal Rule of Civil Procedure 50. (Initial Brief "IB", p. 17). This Court's review is, therefore, *de novo*, applying the same standard as the district court. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). Under that standard, the court "should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000). The Court construes all inferences in favor of the nonmoving party, but also "gives credence" to evidence supporting the moving party that is "uncontradicted and unimpeached." *Id.*

This case involves two theories of negligence with the same measure of damages. As such, "only a single recovery is allowed." *St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1203 (11th Cir. 2009). In such cases, a jury's general verdict "will be upheld if it is supported by one of theories upon which the case is submitted to the jury." *Geneva Cty. Bd. of Educ. v. CAN Ins.*, 87 F.2d 1491 (11th Cir. 1989). Accordingly, the jury's verdict should stand if this Court finds no error in either one of the negligence claims. *See e.g.*, *Ondrisek v. Hoffman*, 698 F.3d 1020, 1026-27 (8th Cir. 2012) ("[T]he award should stand despite the erroneous submission of another theory, where the damages are the same under a properly submitted theory.").

## SUMMARY OF THE ARGUMENTS

### I.

The district court did not err in granting JMOL on the breach element of the negligence claim. The court ruled that the USTA owed McKenzie a heightened duty of care that required it to protect her from sexual misconduct, including "limiting instances in which a coach and a player can be alone and wholly unmonitored." (Doc. 164, p. 27); (Doc. 247, p. 10). The USTA did not challenge—and thus concedes—that it is subject to this heightened duty of care. At trial, the USTA admitted, repeatedly, that it did not supervise McKenzie during her training sessions with Aranda. As the Florida Supreme Court has advised, "the total failure to supervise" is a breach of the special-relationship duty. *Rupp v. Bryant*, 417 So. 2d 658, 668, n.27 (Fla. 1982). There being "no legally sufficient evidentiary basis for a reasonable jury to find for" the USTA on the issue of supervision, it was appropriate for the court to enter judgment on the issue of breach. Given the lack of evidence of supervision, the district court likewise did not err in denying the USTA's motion for JMOL on the issue of breach.

### II.

The district court did not err in granting JMOL in favor of McKenzie on the notice and breach elements in the negligent retention and supervision claim. This claim required McKenzie to prove that the USTA knew of

Aranda's unfitness for employment, and that it failed to take steps to protect McKenzie from him. The court found that the USTA knew that Aranda was unfit for employment by legally imputing the knowledge of its agent, Battaglia, to the USTA. It was undisputed that Battaglia knew Aranda was unfit for employment. Knowledge that an agent has a duty to report is material to that agent's duties. It was undisputed that Battaglia was a mandatory reporter pursuant to federal law and USTA's own policies. Because she had a duty to report her knowledge of Aranda to the USTA, her knowledge was imputed to the USTA as a matter of law. The court did not err in removing this legal issue from the jury's factual consideration. With notice that Aranda was unfit for employment, it was undisputed that the USTA did nothing to protect McKenzie from this dangerous employee. Judgment on the element of breach was therefore appropriate. For these same reasons, the court did not err in denying the USTA's motion for JMOL.

## III.

The district court did not err in denying the USTA's motion for JMOL on punitive damages. The record was replete with clear and convincing evidence that the USTA was grossly negligent, including evidence of its long-documented resistance to implementation of policies intended to protect athletes, and including resisting a complete ban on sexual contact between

coaches and athletes, stating that such a prohibition would be "impractical" in tennis because it was far too common. This position was taken after the USTA was provided information confirming that athletes lack the power to consent to sexual contact in the coaching relationship due to the imbalance of power. The USTA still fought to maintain the status quo of a culture that allowed coaches to engage in nonconsensual relationships with athletes. The jury heard from another prominent tennis athlete who also was a victim of sexual misconduct in the coaching relationship who provided testimony that suggested that the USTA took steps to silence her and other victims of sexual misconduct. This testimony was consistent with McKenzie's testimony, which suggested that the USTA took steps to silence her and interfere with her relationships. In sum, there was sufficient evidence to support the jury's determination that USTA was grossly negligent.

<u>**ARGUMENT**</u>

## I. Plaintiffs' Motion for Judgment as a Matter of Law

The district court granted McKenzie's Motion for JMOL on the breach element of the negligence claim, and on the notice and breach elements of the negligent retention/supervision claim. (Doc. 228); (Doc. 265, 70:19-87:4). Neither was in error.

### A. Negligence Claim

McKenzie begins with the negligence claim, which differs from the order of arguments in the USTA's IB. This decision was purposeful. This case, at its core, is a simple negligence case. If this Court affirms on the negligence claim—as it should—it need not reach the issues relating to negligence retention and supervision. *See Geneva Cty.*, 87 F.2d 1491.

A claim for negligence includes four elements: (1) duty, (2) breach, (3) causation, and (4) damages. *Clay Elec. Coop, v. Johnson*, 875 So. 2d 1182, 1185 (Fla. 2003).

#### 1. The court did not err in granting judgment on the duty element.

a) <u>The USTA abandoned any challenges to duty.</u>

The first element of McKenzie's negligence claim was established through summary judgment, where the district court ruled as a <u>matter of law</u> that the USTA owed McKenzie a heightened duty of care under Florida's

"special relationship" test. (Doc. 164, pp. 23–28). The court ruled USTA owed McKenzie a duty of care to "protect players in its training program from sexual assault," which it held was a foreseeable harm. (Doc. 164, p. 25). The court reaffirmed this ruling at trial. (Doc. 247, p. 10); (Doc. 219, p. 9). The USTA does not challenge the court's judgment on duty, so duty is not at issue in this appeal. *Kellner v. NCL (Bahamas),* 753 F. App'x 662, 665 (11th Cir. 2018); *Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 679 (11th Cir. 2014).

b) <u>The district court did not err in applying a heightened duty of care</u>.

Abandoned or not, the court did not err in resolving the duty element as a matter of law. Under Florida law, the duty of care "is a minimal threshold legal requirement for opening the courthouse doors." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). Whether a relationship constitutes a "special relationship" is "a question of law[.]" Restatement (Third) of Torts, § 40. "[A] legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain*, 593 So. 2d at 502.

The district court ruled that sexual misconduct within the coaching relationship was a foreseeable harm. Sexual misconduct in sports had become so widespread that it spawned federal legislation to curtail such abuse. (Doc. 164, p. 25). The USTA reported numerous instances of sexual

misconduct between 2013 and 2018, ultimately leading it to enact more protective policies. (*Id.* at p. 26). These facts were all confirmed at trial and were undisputed. (Doc. 226-12); (Doc. 260, 65:2-67:10). Such facts demonstrate the "risk of sexual misconduct by coaches [was] sharply defined." (Doc. 164, p. 26). Considering the foreseeability of the harm, the court turned to whether the USTA owed McKenzie a heightened duty of care.

"The general rule is that a party has no legal duty to 'prevent the misconduct of third persons.'" *Michael & Philip, v. Sierra*, 776 So. 2d 294, 297 (Fla. 4th DCA 2000). An exception exists where there is a "special relationship between the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable victim of that conduct." *Palmer v. Shearson Lehman Hutton*, 622 So. 2d 1085, 1089 (Fla. 1st DCA 1993). Special relationships typically arise "where the relationship places the defendant in a superior position to control the risk, such as where the defendant has substantial control over the plaintiff so as to deprive the plaintiff of his or her normal opportunities for protection." *Saunders v. Baseball Factory*, 361 So. 3d 365, 370 (Fla. 4th DCA 2023). Such rule is applicable here—USTA convinced McKenzie to leave her home and family, live under their auspices, and train at their facilities under their coaches.

Clearly, this qualifies as a "special relationship" under Florida law.[3] Indeed, Florida recognizes numerous "special relationships" that are "protective by nature, requiring the defendant to guard his charge against harm from others," such as those between employers and their employees, hospitals and their patients, and schools and their pupils. *Knight v Merhige*, 133 So.3d 1140, 1145 (Fla. 4th DCA 2014).

In *Limones v. School District of Lee County*, 161 So. 3d 384 (Fla. 2015), the Florida Supreme Court held the school/student special relationship gives rise to a duty "to reasonably supervise its students during all activities that are subject to the control of the school, even if the activities occur beyond the boundaries of the school or involve adult students." *Id.* (emphasis added); *see also Nova Southeastern Univ. v. Gross*, 758 So. 2d 86, (Fla. 2000) (recognizing a "special relationship" between a university and its adult students). Applying this precedent, the district court found the USTA's relationship with McKenzie was akin to that of a school with its students. The court explained: "Since USTA controls both the facility and its coaches for those athletes in its training program, players like McKenzie rely on Defendants to take reasonable steps to prevent opportunities for abuse

---

[3] Florida has adopted the "special relationship" test set forth in the Restatement (Second) of Torts, Section 315. *See Bater v. Unique Vacations,* No. 17–21703, 2020 WL 5514399, at *6 (S.D. Fla. Aug. 17, 2020).

from presenting themselves during training session and events, like limiting instances in which a coach and player can be alone and wholly unmonitored, which is the hallmark of special relationships." (Doc. 164, p. 27.) It thus concluded the USTA had an affirmative duty to monitor or supervise McKenzie during her training sessions to prevent the foreseeable harm of sexual misconduct. (Doc. 164, p.27); (Doc. 247, p. 10).

Because the district court's uncontroverted decision on duty is consistent with Florida law, judgment on the duty element should be affirmed.

### 2. The court did not err in granting judgment on the issue of breach.

The failure to conform to the required duty of care is a breach thereof. *Clay*, 873 So. 2d at 1185. Whether a duty was breached is typically reserved for the factfinder. *Williams v. Davis*, 974 So. 2d 1052, 1057, n.2 (Fla. 2007). But where, as here, "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party," it is the court's duty to enter judgment as a matter of law. *Reeves*, 530 U.S. at 149 (2000) (quoting Fed. R. Civ. P. 50(a)). The Florida Supreme Court has advised that, within special relationships, "the total failure to supervise can be a breach of [the special-relationship] duty." *Rupp*, 417 So. 2d at 668, n.27.

a) <u>The evidence was undisputed that the USTA breached the special-relationship duty.</u>

The district court's ruling on the duty element was clear: The USTA owed McKenzie a duty to supervise and protect. And the evidence at trial was undisputed—the USTA <u>did nothing</u> to supervise, monitor, or protect McKenzie during her one-on-one practices with her coach. Accordingly, there was no evidentiary basis for a reasonable jury to find for the USTA on the question of breach. Judgment as a matter of law was, therefore, required.

The undisputed evidence showed that the USTA knew that Aranda was scheduling practices alone with McKenzie when no one else was around. Blackman—USTA's general manager—testified Aranda had reserved the clay courts for practices with McKenzie at times when he would be "the only person training on those courts." (Doc. 262, 24:16–20). These reservations were made in advance, were sent directly to a USTA "facilities person," and were viewable by other USTA personnel. (*Id.* at 23:4–12). Why was an older male coach able to schedule "training" sessions with a young female athlete at times when no one else would be present at the facilities? Incredibly, as Blackman admitted, "[w]e don't supervise our practices." (*Id.* at 26:5–16).[4]

---

[4] This testimony was "uncontradicted and unimpeached," and was provided by a witness disinterested from McKenzie—indeed, it came from the USTA's General Manager—and should be afforded credence. *See Reeves*, 530 U.S. at 151; *Santiago v. Sanders*, No. 15-13452, 2017 WL 11684722, at *2 (11th Cir. Aug. 8, 2017) (affirming the grant of a JMOL based on the nonmoving party's admission).

This is an undisputed admission that the USTA breached the clear duty to "prevent opportunities for abuse" by, for example, preventing or "limiting instances in which a coach and [McKenzie] can be alone and wholly unmonitored." (*See* Doc. 164, p. 27)

In addition, Blackman testified that the USTA was capable of supervising coach-athlete training at all times. (Doc. 262, 17:12–14). They just chose not to. (*Id.* at 26:5-16). Ola Malmqvist ("Malmqvist"), the Head of Women's Tennis, testified he was "sure" that Aranda coached female players like McKenzie without supervision. (Doc. 260, 222:20–223:3). Lauren Tracy ("Tracy")—USTA's senior director of strategic and business operations—testified the cameras for the courts where Aranda coached McKenzie were turned off during McKenzie's practices. (Doc. 260, 33:22-34:2). Kathy Rinaldi ("Rinaldi")—Aranda's supervisor—testified she was out of the country the entire time McKenzie was training with Aranda and never observed any practice sessions. (Doc. 261, 8:21-9:15).

At trial, not a single witness or piece of evidence controverted the collective admissions that the USTA failed to supervise or monitor McKenzie's sessions with Aranda. Instead of citing to evidence of supervision, the USTA cites to the background checks it conducted on employees and mandatory annual employee training. (IB, p. 55). These facts

are completely irrelevant to the question of whether the USTA reasonably supervised McKenzie. Just as a school must do more than run background checks on teachers to satisfy its duty to supervise and protect students, the USTA must do more than run background checks on coaches. The USTA was under a duty to reasonably supervise McKenzie during all activities subject to its control. *See Limones*, 161 So. 3d at 390. The USTA <u>admittedly</u> breached this duty.

The remaining facts the USTA cites likewise fail to create a jury issue on breach. For example, the USTA cites testimony that the tennis courts *could* have (hypothetically) been monitored. (IB, p. 61). The USTA insists the clay courts where McKenzie trained with Aranda were viewable from the PD building. (*Id.* (citing Doc. 264, pp. 168–69)). That view is from windows on the second floor of the building. (Doc. 225-3) (Doc. 262, 27:20-28:11).[5] Employees and other members of the PD program (again, hypothetically) could look out those windows when using the break room. (Doc. 261, 27:20–28:11). So what? Whether it would have been reasonable for the USTA to comply with its heightened duty of care by monitoring McKenzie from these upstairs windows (across a row of hard courts, and past two blacked-out

---

[5] A view of the PD building, and windows can be seen at minute 1:30 of the video included as Joint Exhibit 16. (Doc. 225-36); (Doc. 263, 241:11–243:5).

fences), was ultimately not presented at trial. The USTA did not present a single witness who testified they did in fact observe (let alone supervise) the coaching sessions from these windows. (Doc. 247, p. 17). Plaintiff agrees that Defendant could have made a minimal effort to prevent her from being sexually abused—the problem is that it did not.

The same goes for testimony that the tennis courts could be observed by the maintenance crew. (IB, p. 61). Whether it would have been reasonable for the USTA to delegate its duty to protect McKenzie to a maintenance worker was not before the jury or the district court.[6] The USTA did not present testimony that maintenance workers were informed or trained to monitor athletes, and it did not present testimony that a maintenance worker in fact observed McKenzie—certainly, there was no evidence that landscapers were responsible and/or trained both to cut grass and prevent sexual abuse. The undisputed evidence is that the USTA did <u>not</u> monitor, supervise, or protect McKenzie during her sessions with Aranda.[7]

---

[6] Even if this issue had been prevented at trial, the duties created by a special relationship are non-delegable. *Hinckley v. Palm Beach Cnty. Bd. of Cnty. Comm'rs*, 801 So. 2d 193, 196 (Fla. 4th DCA 2001). The USTA's attempt to deflect blame to its groundskeepers should be ignored.

[7] The USTA states that "players' family and friends were frequently present in the training area." (IB, p. 61). The only testimony cited to support this claim is from CiCi Bellis, who testified that her parents and grandparents visited her practices frequently. (Doc. 264, 169:15–16). So, <u>one player's</u> family frequently visited. There was no evidence that other "players'" families visited. Ms. Bellis's family "lived really close to the campus," (Doc. 264,

The USTA's reliance on testimony from its expert likewise falls short. While the USTA's retained expert posited that the USTA had no obligation to supervise McKenzie, this legal conclusion is contrary to the district court's <u>unchallenged</u> ruling on duty and well-established Florida law. "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997).

b) <u>The USTA misstates the court's ruling on breach</u>.

The USTA mischaracterizes the district court's ruling on breach as being undergirded by only two reasons: "[The USTA] did not have continuous real-time video monitoring of all practices, and it did not apply the 'rule of three' to adult players on open and observable tennis courts." (IB, p. 56). This is wrong. The court cited extensive testimony supporting its ruling and concluded there was no countervailing evidence demonstrating the USTA fulfilled its duty to monitor coach-athlete interactions. (Doc. 247, pp. 10–18). As the court summarized:

> The USTA left to chance its legal duty to protect young athletes from the foreseeable risk of sexual abuse created by the power imbalance coaches enjoy over aspiring athletes. Accordingly,

---

28:18–25), unlike McKenzie's, whose immediate family were not even in the same state, (Doc. 263, 107:23–108:1); (Doc. 260, 113:14–15).

> there was no issue for the jury's consideration on the breach of the duty owed to Ms. McKenzie.

(Doc. 247, p. 18). The suggestion that the court limited its ruling to facts related to video monitoring or the correct interpretation of the Rule of Three is folly.

The USTA misunderstands the importance of the lack of video monitoring. Video monitoring is but one method the USTA could have used to fulfill its supervisory duties. The district court did not hold that the USTA was required to monitor all practices through live feed video monitoring. The lack of video monitoring is simply additional evidence—on top of the wholesale failure to monitor with live personnel—that confirmed the USTA did not monitor McKenzie and Aranda's sessions. The lack of video monitoring, in other words, was some of the, but not the only, evidence supporting the breach.

The USTA devotes significant discussion to the correct interpretation of the Rule of Three. According to the USTA, the Rule of Three is an internal policy and did not define the "standard of care." (IB, p. 60). True enough. The USTA's legal duty arises from Florida law, not USTA's (disregarded) internal policy. That duty is a product of common law and included "limiting instances in which a coach and [McKenzie] can be alone and wholly unmonitored." (Doc. 164, p. 27). The Rule of Three, and the USTA's disregard

for it, is simply additional evidence that the USTA breached its duty. The cases USTA cites support this interpretation. *Pollock v. Fla. Dept. of Highway Patrol*, 882 So. 2d 928, 936–37 (Fla. 2004) ("[A] written policy or manual may be instructive in determining whether the alleged tortfeasor acted negligently in fulfilling an independently established duty of care...."). That USTA completely ignored its own policy is evidence of a *breach*, not the basis of a *duty*.

Even if there were no written "Rule of Three" policy, the USTA owed a duty to protect and supervise. As the district court explained:

> [Y]ou don't need the code to say that you need supervision; otherwise, you know, it's negligent. . . . . The code has been, I think, artificially driving some of this discussion when common sense experience and knowledge really dictates the outcome.

(Doc. 265, 77:14–21). This Court need not determine whether the district court correctly interpreted the Rule of Three; the USTA had a common-law duty to supervise McKenzie irrespective of the policy, and the undisputed evidence confirms it breached that duty.[8]

---

[8] Although irrelevant, the district court did not err in interpreting the Rule of Three as applying to both minors (children) and teenagers because the plain language of the rule says it applies to both a "<u>child</u> or <u>teen</u>." (Doc. 225-4, p. 10). If the USTA wanted the policy to be limited to minors, it could have specifically said so, as it did in previous versions of the Rule, (Doc. 264, 276:4–8), demonstrating that the USTA made the conscious and informed decision to remove the word "minor" from its policy. (*Id.*, 276:9–16).

The USTA's "uncontradicted and unimpeached" admissions that it did not supervise McKenzie "left no legally sufficient evidentiary basis for a reasonably jury to find for" the USTA on the issue of breach. *See Reeves*, 530 U.S. at 150–51; *Santiago*, 2017 WL 11684722. The district court did not err in granting judgment as a matter of law as to breach.

    c) <u>The punitive damages award confirms the court correctly granted judgment as to breach</u>.

The district court's judgment on breach was confirmed by the jury's decision on punitive damages. Punitive damages can be based on a finding of gross negligence, which is defined as conduct that "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." (Doc. 220, p. 2). Gross negligence entails an elevated degree of negligence and necessarily includes simple negligence. *See Atl. Coast Line R. v. Wauchula Mfg. & Timber*, 64 So. 356, 357 (Fla. 1914) ("'Gross negligence' includes 'negligence,' but 'negligence' may not include 'gross negligence.'"). That the jury found gross negligence necessarily means the jury found USTA breached its duty.

## B. Negligent Retention and Supervision

Florida recognizes a cause of action for negligent retention and supervision. *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954).[9] A prima facie claim is made by showing an employer (1) knows or should know about the employee's unfitness and (2) fails to take appropriate action. *Garcia v. Duffy*, 492 So. 2d 435, 441 (Fla. 2d DCA 1986).[10]

### 1. The district court did not err in imputing knowledge to the USTA.

The district court granted judgment on the notice element by imputing knowledge of Aranda's unfitness to the USTA. Under Florida law, "knowledge or notice that an agent acquires while acting within the course and scope of his authority is generally imputed to his principal." *Dye v. Tamko Bldg. Prods.,* 908 F.3d 675, 685 (11th Cir. 2018); Restatement (Third) Of Agency § 5.03 (2006) ("[N]otice of a fact … is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal…."). Whether knowledge can be imputed is typically a legal issue

---

[9] In *Mallory*, the Florida Supreme Court adopted section 317 of the Restatement (Second) of Torts.

[10] As with simply negligence, causation and damages are elements of a claim for negligent retention and supervision. *See Harrison v. Tallahassee Furniture*, 529 So.2d 790 (Fla. 1st DCA 1988).

for the court. *LanChile Airlines v. Conn. Gen. Life Ins.*, 759 F. Supp. 811, 814 (S.D. Fla. 1991).

a) <u>Jessica Battaglia possessed actual knowledge of Aranda's unfitness</u>.

It was undisputed at trial that USTA's manager of PD events and programming, Battaglia possessed actual knowledge that Aranda had a propensity for sexual misconduct. Bataglia testified about her own experience with Aranda from 2014, when she experienced "sexual misconduct" by Aranda while on a work trip with the USTA. (Doc. 262, 105:13–107:24). Battaglia testified "the behavior was similar" to what McKenzie experienced. (*Id.,* 109:8–13); (Doc. 226-1).

b) <u>Battaglia was an agent of the USTA</u>.

There is no dispute that Battaglia was an employee and agent of the USTA at all relevant times. The parties stipulated: "Battaglia was hired by defendants in March of 2006," and in 2017, she "received the title of manager, PD events and programming." (Doc. 265, 60:6–12); (Doc. 262, 81:16–88:14). Accordingly, any knowledge she obtained that "is material to [her] duties to the [USTA]" can be imputed to the USTA. *See Dye*, 908 F.3d at 686.

c) <u>Battaglia's knowledge was material to her duties.</u>

To be imputed, knowledge must concern "some fact connected with the particular duties that the agent is authorized to perform for the principal." *Jacksonville, T. & K.W. Ry. v. Peninsular Land*, 9 So. 661, 686 (Fla. 1891); *Anderson v. Walthal*, 468 So. 2d 291, 294 (Fla. 1st DCA 1985). Knowledge that an agent has a duty to communicate "will be chargeable" to the principal. *See, e.g.*, *First Bond & Mortg. v. Yancey*, 139 So. 597, 599 (Fla. 1932); Restatement (Second) Agency § 275.[11]

Here, the court held Battaglia's knowledge of Aranda's unfitness was imputed to the USTA because Battaglia was under a duty to disclose her knowledge. (Doc. 247, p. 22). The district court relied on overwhelming testimony that Battaglia was a "mandatory reporter" and was required by law and USTA's policies to report sexual misconduct for the purpose of protecting athletes.

### i. *All USTA employees have a duty to safeguard athletes from abuse.*

One of the USTA's most important functions is to safeguard athletes from abuse. (Doc. 260, 25:3–20; 108:1–13). All USTA employees receive

---

[11] Restatement (Third) Of Agency's § 5.03 Illustration 5 is helpful in describing the imputation of knowledge when there is a duty to report. There, a corporation hired an environmental engineer, whose duties include reporting environmental compliance pursuant to "governmental regulations." *Id.* The engineer observed a pipe leaking near a stream. Notice and knowledge of the leaky pipe is imputed to the corporation even though the engineer failed to report the leaky pipe. *Id.*

yearly training about safeguarding athletes, "regardless of whether they're coaches or admin." (Doc. 261, 57:1–58:24). The training is intended "to create the safest possible environment for the athletes that [the USTA] train[s]." (*Id.*). Each employee has a duty to protect the athletes in the USTA's programs from sexual misconduct. This duty applies to Battaglia. (Doc. 262, 88:16–89:24). Accordingly, any knowledge that Battaglia possessed that could affect the safety of athletes is material to her duties to the USTA. (Doc. 260, 108:11–14) ("[K]nowledge [] that an employee is a risk to athletes is pertinent to the USTA"). Battaglia's knowledge that Aranda had a propensity for sexual misconduct, therefore, is material to her duties to the USTA and is imputed to the USTA as a matter of law.

ii.    *Battaglia was a mandatory reporter pursuant to the Safe Sport Code.*

Battaglia was a mandatory reporter obligated to report what she knew of Aranda. (Doc. 247, p. 20). The duty to report sexual misconduct was codified in the Safe Sport Code in 2017. (Doc. 225-6). The Code was promulgated by the Center pursuant to its authority under federal statute, 36 U.S.C. § 220541(a)(1)(C), which tasked the Center with developing "policies[] and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies." Under the law, "the

policies and procedures developed under subsection (a)(1)(C) <u>shall apply as though they were incorporated in and made a part of</u>" the statute. 36 U.S.C. § 220541(b) (emphasis added). Accordingly, the *Code* applies as if it "were incorporated in and made a part of" the Safe Sport *Act*. *Artistic Ent. v. City of Warner Robins*, 331 F.3d 1196, 1206 (11th Cir. 2003). As incorporated in the act, interpretation of the Code is a legal question for courts to decide. *Barrientos v. CoreCivic*, 951 F.3d 1269, 1276 (11th Cir. 2020). If the language is clear and unambiguous, the court "need go no further." *Id.*

The parties jointly put in evidence the Code version in effect at the time of McKenzie's abuse. (Doc. 225-6); (Doc. 260, 60:7–16). The Code includes a mandatory reporting requirement, providing all "Covered Adults *must* report to the Office conduct of which they become aware that could constitute [] sexual misconduct...." (Doc. 225-6, at 16). The mandatory reporting requirement "is an ongoing one and is not satisfied by making an initial report. The obligation includes reporting, on a timely basis, all information about which a Covered Adult becomes aware." (*Id.*).

Battaglia admitted she was a "Covered Adult" and a "mandatory reporter." (Doc. 262, 90:1-3; 91:12-13; 125:4-6). In fact, every USTA employee admitted their mandatory reporting duty which required them to report even suspicions of sexual misconduct. (Doc. 260, 209:9-210:10);

(Doc. 261, 28:5-29:2); (Doc. 260, 27:3-13); (Doc. 260, 209:7–24). There simply is no dispute that Battaglia was a "mandatory reporter" with a duty to report sexual misconduct. Her knowledge of Aranda's previous misconduct, therefore, was legally attributable to the USTA. *See Yancey*, 139 So. at 599; Restatement 2d Agency § 275.

In a bid to negate Battaglia's undisputed duty to report, the USTA argues the district court erred by treating the Code as if "it were binding federal law" because doing so would violate the "non-delegation doctrine." (IB, p. 44). This non-delegation argument can be set aside because it was not raised as part of the USTA's motions for JMOL. *See Middlebrooks v. Hillcrest Foods*, 256 F.3d 1241, 1246 (11th Cir. 2001) (arguments not raised in pre-verdict motion not preserved on appeal). The Court should decline to engage in a constitutional analysis of the non-delegation doctrine based on the USTA's unpreserved and unsupported reference to the doctrine.

The USTA next argues Battaglia's knowledge can only be imputed to the Center (not the USTA) because the imputation can only flow to "the entity 'to which an agent owes a duty'." (IB, p. 48). This argument, too, was not raised at trial and should be disregarded. On the merits, the argument also fails because it was undisputed at trial that the policies set forth in the Code were incorporated in full into the USTA's "SafePlay" policies. (Doc. 260,

80:24-35; 60:1-4; 61:2-3). The USTA had in place mandatory reporting requirements even before the Center was created. (Doc. 260, 209:16-24). Indeed, the USTA's SafePlay Policies contain reporting requirements. (Doc. 225-4). Any argument made now (for the first time on appeal) that the USTA's own policies did not include the mandatory reporting requirement is flatly contradicted by the undisputed evidence and testimony.

### iii. *The mandatory reporting requirements are not limited to conduct directed towards athletes or minors*.

USTA argues that the mandatory reporting requirements did not apply to Battaglia because she was only required to report misconduct directed towards athletes or minors (meaning that, according to Defendant, because she was neither, she had no obligation to report Aranda's sexual misconduct directed at her). Setting aside that this makes no sense—sexual misconduct directed at non-athletes is no different in kind than sexual misconduct directed at athletes—such argument is incorrect and conflicts with record evidence and plain language of the mandatory reporting requirements.

Determining the scope of Battaglia's reporting requirements begins with the Code's plain language. If the language is clear and unambiguous, the court "need go no further." *Barrientos*, 951 F.3d at 1276. The Code's text does not limit the mandatory reporting requirement to conduct directed towards athletes or minors.

The mandatory reporting requirement dictates that:

> Covered Adults <u>must</u> report [] conduct of which they become aware that could constitute (a) <u>sexual misconduct</u>, (b) misconduct that is reasonably related to the underlying allegation of sexual misconduct and (c) retaliation related to an allegation of sexual misconduct.

(Doc. 225-6, p. 16) (emphasis added). "Sexual misconduct" is defined as including:

> (a)  Sexual Conduct (or attempts to commit the same), without Consent, (b) Sexual Conduct (or attempts to commit the same), where there is a Power Imbalance,[12] regardless of purported Consent, (c) Sexual Harassment, (d) an Intimate Relationship involving a person in a Position of Power where a Power Imbalance exists.

(*Id.* at p. 10).

Of these types of sexual misconduct, only Sexual Harassment is limited to conduct directed toward an athlete. (*Id.* at p. 6) (defining Sexual Harassment as "Conduct … toward an athlete"). "Sexual Conduct without Consent"—the type of sexual misconduct directed at Battaglia—is not limited to conduct toward athletes. If the Center wanted to limit the reporting requirements to Sexual Conduct directed to athletes, it could have done so as it did with the definition of Sexual Harassment.

The mandatory reporting requirements are also not limited to minors as argued by the USTA. The Code defines "Sexual misconduct" separately

---

[12] The Code specifically states that a Power Imbalance is presumed in all coach-athlete relationships, "regardless of age." (Doc. 225-6, p. 9).

from "Sexual misconduct involving minors." (*Id.* at p. 10). The mandatory reporting requirement mandates reporting of all "sexual misconduct," regardless of whether a minor was involved. Further, the Code includes a separate provision for reports of child abuse. (*Id.* at p. 17). If the mandatory reporting requirement of sexual misconduct were limited only to misconduct towards minors, it would be illogical to parse out separate sections specific to sexual misconduct involving minors. Comparing this provision to the mandatory reporting requirement for sexual misconduct confirms that Battaglia's duty to report was not limited to conduct directed to athletes or minors but rather encompassed all sexual misconduct of which she became aware. In light of her duty to report her knowledge that Aranda was unfit for employment, the district court did not err in imputing her knowledge to the USTA.

d) Battaglia's knowledge is attributable regardless of the reasons why she did not report.

The USTA stresses that, as a matter of policy, Battaglia should not have to report her own sexual abuse. This argument is irrelevant to the legal question of the imputation of knowledge.

Under Florida law, a corporation is charged with the knowledge of its agents "even though the officer or agent does not in fact communicate the knowledge to the corporation." *Gutter v. E.I. Dupont De Nemours*, 124 F.

Supp. 2d 1291, 1309 (S.D. Fla. 2000). There are myriad justifications for this bright-line rule: "One of the justifications advanced for this rule is that 'the agent, while acting within the scope of his agency is, as to matter embraced within the agency, the principle himself or the alter ego of the principal.'" *Id.* The law does <u>not</u> provide exceptions to the imputation of knowledge in instances when the agent might have a personal reason for keeping silent. Restatement (Third) Of Agency § 5.03 ("A principal may not rebut the imputation of an agent's notice of a fact by establishing that the agent kept silent."). Such an exception, if applied, would invite courts to delve into the subjective mindset of agents before knowledge could ever be imputed to the principal. If embraced, this shot-from-the-hip exception would swallow the rule, contravene blackletter agency law principles, and result in principals being simultaneously knowledgeable and ignorant of business carried out by their agents. As a policy matter, it would reward principals for creating cultures of silence in their organizations (or, at least, with their agents). The USTA cites no authority for creating such an exception to long-standing Florida law.

For its argument that Battaglia had no duty to report her own abuse, the USTA cites evidence and testimony that was not presented at trial and thus could not have factored into the decision whether to direct a verdict

based on the trial evidence. The USTA cites subsequent versions of the Code that were not in effect at the time of McKenzie's abuse and were excluded by the court through motions *in limine*. (Doc. 173, p. 3(b)). The USTA has not challenged these evidentiary rulings. It simply states the "court improperly barred USTA from presenting this evidence." (IB, p. 46). This is insufficient to challenge an evidentiary ruling on appeal. The USTA, therefore, waived any challenge to the court's evidentiary rulings.[13] If it wanted to challenge the decision to exclude evidence from trial, it should have appealed that decision as a predicate to then arguing such evidence would have altered the court's analysis. Without the predicate, there is no basis for the secondary argument.

The only legal support offered by the USTA is a Sixth Circuit case that discusses the privacy protections that support rape shield laws. (IB, p. 45) (citing *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998)). *Bloch* has nothing to do with the imputation of knowledge and merely recognizes that crime victims have privacy interests. True enough. But the imputation of Battaglia's knowledge does not infringe upon victims' right to privacy. Both the USTA and the Center had mechanisms in place allowing Battaglia to report

---

[13] Similarly, the USTA cites an affidavit from a witness the USTA did not call at trial. It suggests this witness was excluded by the court through motions in limine. Not so. The court excluded the irrelevant versions of the SafeSport Code and any testimony interpreting those versions. The court did not exclude this witness from testifying at trial. (Doc. 177, 103:11–105:12).

anonymously. (Doc. 225-4); (Doc. 225-6, p. 14); (Doc. 264, 234: 7–17). Regardless, the law allows for the imputation of knowledge without precondition that the agent possesses an illegitimate reason to stay silent. The district court did not err in imputing knowledge to the USTA.

### e) *Battaglia's other duties support the imputation of knowledge.*

In addition to Battaglia's duty to report, her other employment duties to the USTA support the imputation of her knowledge. Battaglia testified that she was promoted to manager of events and programming in 2017, when she began "manag[ing] projects and events." (Doc. 262, 83:1). "One of the projects that [Battaglia] helped manage" involved mentoring of athletes with coaches. (*Id.* at 84:8–85:15). (*Id.* at 85:16–21, 87:10–12). The district court relied on these facts and held these "duties support the imputation of her knowledge to the USTA." (Doc. 247, p. 33). These facts were uncontroverted and unimpeached.

The USTA strains to manufacture an issue of fact on the scope of Battaglia's duties by arguing the ruling on the imputation of knowledge was "[b]ased on a mistake about the record." (IB, p. 42). The supposed "mistake" consists of the court's oral remarks that Battaglia was "[v]ery high up in the chain" and that her "duties included pairing coaches with athletes interested

in becoming coaches." (*Id.* at pp. 42-43). Neither of these statements amount to a mistake and, even if they did, such facts are irrelevant.

Related to Battaglia's position in the "chain," the parties stipulated she was promoted to manager of PD events and programming. (Doc. 265, 60:6–12). There is no dispute that Battaglia was a manager. Also, precisely how "high up in the chain" an employee is for purposes of the imputation of knowledge is beside the point. It is well-settled that knowledge of a fact may be imputed when the fact is material to the agent's duties to the principal, wherever on the chain the agent may be. *See Dye*, 908 F.3d at 686.[14] The USTA cites no case that holds an employee must be "high up in the chain" before imputation attaches.

The USTA also takes aim at the court's statement that Battaglia's "duties included pairing coaches with athletes interested in becoming coaches." The USTA disputes this based on Battaglia's testimony that she was only involved with "logistics and planning" for the project that paired athletes with coaches as mentors. (IB, p. 43). This is a distinction without a difference. Battaglia testified that part of her job was to "put on continuing education programs for coaches," (Doc. 262, 84:8–85:5), and help "manage"

---

[14] Notably, an agent need not even be employed by their principal (*i.e.*, they may exist nowhere on "the chain") for the agent's knowledge to be imputed to the principal. *See, e.g.*, *Symons Corp. v. Tartan-Lavers Delray Beach*, 456 So. 2d 1254, 1257 (Fla. 4th DCA 1984) ("It is not necessary that one be an employee of a corporation to be its agent.").

and "create" the mentorship program that paired coaches with athletes, (*id.* at 85:12–87:12). Her participation in creating and managing programs that paired athletes with coaches <u>in any capacity</u> supports the decision to impute Battaglia's knowledge.

In sum, Battaglia worked as a USTA employee for twelve years by the time that Aranda sexually harassed, groomed, and assaulted McKenzie. She had worked as a manager of PD events and programming for over a year at the time of McKenzie's abuse. And she was a mandatory reporter, required by law and USTA's policies to report any knowledge of sexual misconduct. Not one of these facts is disputed. Because she was an agent, with a duty to report knowledge of misconduct, the court did not err in imputing Battaglia's knowledge of Aranda's previous sexual assault to the USTA.

### 2. The district court did not err in ruling on foreseeability as it relates to duty.

The USTA argues that even with Battaglia's actual knowledge of Aranda's prior sexual misconduct, it was not foreseeable that he was unfit for employment. According to the USTA, the foreseeability of Aranda's conduct was a "classic jury question." (IB, p. 52). This argument illustrates the USTA's misunderstanding of the foreseeability requirements of Florida's negligence law.

The foreseeability inquiry is "the cornerstone of [Florida] tort law." *Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002). But the foreseeability analysis applies to both the duty and causation elements of negligence. *McCain*, at 502. As to duty, foreseeability "is a minimal threshold *legal* requirement for opening the courthouse doors, whereas [the proximate causation] part [is a] much more specific *factual* requirement that must be proved to win the case once the courthouse doors are open." *Id*. Here, the court ruled on foreseeability as it relates to <u>duty</u> (a legal issue) and allowed the jury to decide foreseeability as it relates to <u>causation</u> (a factual issue). This was proper. *See id.*

The analysis is no different for negligent retention and supervision claims. Indeed, each case cited by the USTA in its foreseeability argument was reviewing foreseeability under the duty element. And each ruled, as a matter of law, whether there was a legal duty. *See e.g., Garcia v. Duffy*, 492 So. 2d 435, 440 (Fla. 2d DCA 1986) (explaining that foreseeability component concerned a nexus between the employment and the assault, not the ability to predict the precise actions of the employee); *Dickinson v. Gonzalez*, 839 So. 2d 709, 713 (Fla. 3d DCA 2003) (finding necessary nexus was lacking when prior incident of misconduct did not relate to the claims raised in the case). These cases do not stand for the proposition that

foreseeability as it pertains to the duty element is an inherently factual inquiry only a jury can decide. On the contrary, each court made the legal determination of whether foreseeability was sufficient to support a duty to open the courthouse doors. This is exactly what the court did here.

And the court did not err in finding foreseeability to support the duty element. As *Garcia* instructs, to establish a duty for negligent retention/supervision, there must be a nexus between "the employment in question and the particular plaintiff." This nexus is undisputedly present here. The USTA hired Aranda to coach female athletes. (Doc. 260, 207:22–208:23). McKenzie was placed with Aranda as part of her training program. (Doc. 263, 240:1–6). She trained with Aranda on USTA's campus pursuant to USTA-dictated schedules. (Doc. 226-8); (Doc. 262, 21:4–12). McKenzie would have had no interaction with Aranda but for his employment with the USTA. The USTA knew of the dangers of sexual misconduct associated with the coaching relationship and attendant power imbalance. (Doc. 226-8, p. 5) (stating that sport is "a high-risk environment for misconduct"); (Doc. 226-44) (same). Under *Garcia*, there is a significant nexus between McKenzie and Aranda's employment to establish foreseeability.

The two incidents of misconduct are remarkably similar. Both involved Aranda forcibly grabbing the private parts of women without consent.

Battaglia agreed that the incidents were similar, (Doc. 262, 109:11), and that what she experienced met the definition of sexual misconduct defined in the Code, (*Id.* at 107:21–24). It is foreseeable that a coach that previously committed sexual misconduct would do so again. Indeed, Aranda's supervisor, Rinaldi, testified that if she had personally known Aranda had previously sexually assaulted a woman, she would have never let him have access to McKenzie. (Doc. 261, 27:6–20); (Doc. 264, 143:1–15).

As to foreseeability in relation to causation, the "classic jury question" of whether the USTA's conduct "foreseeably and substantially" <u>caused</u> McKenzie's specific injury was properly submitted to the jury. (Doc. 219, p. 10-11) (instructing the jury that it must determine whether the USTA's failure to take further action was the legal cause of loss, injury, or damage). Of course, the jury ruled in McKenzie's favor, meaning it reviewed the facts cited by the USTA and found the USTA's actions were the legal and proximate cause of McKenzie's injuries. (Doc. 221). The USTA provides no basis for setting aside the jury's determination here. *See Moss v. Am. Priv. Equity, LLC*, No. 19-14777, 2021 WL 4848138, at *1 (11th Cir. Oct. 18, 2021) ("Given the deferential standard we apply when reviewing jury verdicts, we find no basis for setting aside the verdicts here.") (citation omitted).

## II.    The USTA's Motion for Judgment as a Matter of Law

The USTA argues that the court erred in denying its Motions for JMOL on all claims. The USTA is wrong.

### A.    Negligence

Respectfully, it is perplexing why the USTA believes it should be entitled to JMOL on the negligence claim. The USTA concedes the district court correctly determined that the USTA was subject to a heightened duty of care that required it to reasonably supervise McKenzie. Notwithstanding its heightened duty, the USTA repeatedly admitted that it did not supervise McKenzie. The USTA did not present at trial, and has not cited on appeal, <u>any</u> evidence that a jury could rely on to find that the USTA supervised McKenzie during her training sessions. Absent any evidence that it met the required standard of care, the USTA could not prevail on the negligence claim, much less be entitled to JMOL. The district court did not err in denying the USTA's Motion for JMOL.

### B.    Negligent Retention and Supervision

The negligent supervision and retention claim turns on the imputation of Battaglia's knowledge. None of the facts cited by the USTA entitle it to JMOL on the issue of imputation. The USTA does not dispute that Battaglia was an agent or an employee. While it tries to quibble with the scope of her duties, there is no dispute that she was, in fact, an agent with a mandatory reporting

requirement. The USTA argues that Battaglia had no authority over Aranda but fails to cite any case law that such authority was required before knowledge can be imputed. And the arguments that Battaglia was not required to report her knowledge, notwithstanding her mandatory reporting duties, can be set aside for the same reasons argued above.

## C.   Punitive Damages

After returning a verdict in McKenzie's favor, the case proceeded to the punitive damages phase. The jury returned a verdict in favor of McKenzie with an award of $6 million in punitive damages (equal to twice that of the compensatory damages). The district court did not err in denying the USTA's motions for JMOL on the punitive damages claim.

### 1. The jury was instructed on the correct standard for punitive damages.

The USTA argues that the "required level of negligence for punitive damages is equivalent to the conduct involved in criminal manslaughter" and that no reasonable jury could have found it "was guilty of a level of gross negligence equivalent to that involved in criminal manslaughter." (IB, p. 65-66.) (quoting *Valladares v. Bank of Am.*, 197 So. 3d 1, 11 (Fla. 2016) (citing the criminal manslaughter standard in dicta)). This is the wrong standard for punitive damages.

"[C]urrent statutes authorize an award of punitive damages based on clear and convincing evidence of <u>gross negligence</u>." *Fleetwood Homes of Fla. v. Reeves*, 833 So. 2d 857, 867 (Fla. 2d DCA 2002), *decision quashed on other grounds*, 889 So. 2d 812 (Fla. 2004) (emphasis added). The precedent applying a "criminal manslaughter" standard predates the current version of this statute. *See Bric Mcmann Indus. v. Regatta Beach Club Condo.*, 378 So. 3d 652, 655 (Fla. Dist. Ct. App. 2023) (the application of the criminal manslaughter standard "is misplaced because it overlooks [] that in 1999 the Florida Legislature revised section 768.72.").

Now, the standard is governed by Fla. Stat. § 768.72, which instructs that punitive damages are available if the defendant was guilty of intentional misconduct *or* gross negligence. Fla. Civ. Jury Instr. 503.1. "Gross negligence" is conduct that "constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* This jury was instructed on this standard, (Doc. 220), which the court applied in resolving the USTA's motions. (Doc. 247, p. 28); (Doc. 265, 29:13–21). This Court should decline the USTA's invitation to apply a dated and incorrect standard to McKenzie's punitive damages claim.

The USTA is also incorrect in arguing the court failed to apply the clear and convincing standard. (IB, p. 66). The court provided the standard

instructions for punitive damages, including the clear and convincing standard. (Doc. 220). The USTA suggests the court failed to apply the clear-and-convincing standard because the court stated there was "competent evidence" to support punitive damages. This in no way indicates an incorrect standard was applied. "Competent evidence" may satisfy the clear-and-convincing standard, or it may not. That the district court observed there was "competent evidence" simply articulates there was sufficient evidence to support the jury's verdict.

## 2. The evidence was sufficient to support the jury's finding that punitive damages were warranted.

Florida Statute § 798.72(3)(c) provides that the USTA can be held liable for punitive damages if: (1) Aranda's misconduct was intentional or grossly negligent, <u>and</u> (2) "[the USTA] engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant."

Under the first prong, Aranda's misconduct is intentional conduct. The Center determined Aranda engaged in an escalation of conduct towards McKenzie, including touching her inappropriately and in a sexual manner, including "touching and rubbing her vulva." (Doc. 226-1). These contacts were (unsurprisingly) determined to be sexual misconduct and battery. (Doc.

226-2, p. 7). Sexual battery is an intentional act that can support punitive damages. *E.g.*, *Myers v. Cent. Fla. Invs.*, 592 F.3d 1201, 1215 (11th Cir. 2010).

There was also sufficient evidence to find the USTA engaged in gross negligence that contributed to McKenzie's injuries. The evidence demonstrated that the USTA was warned about the risks involved with the coach/athlete relationship for years. In 2012, the USOC circulated guidance that warned that "sport can be a high risk environment for misconduct, including . . . Sexual Misconduct." (Doc. 226-5). The USTA agreed specifically that tennis—a one-on-one sport—is one that specifically creates a "high-risk environment for misconduct." (Doc. 260, 43:25–44:1). The 2012 document also includes provisions informing the USTA that athletes cannot consent to sexual contact with coaches due to the imbalance of power inherent to the coaching relationship. (*Id.*, at 45:25–11).

In 2018, the USTA received a letter from Congress regarding the national interest in athlete safety. (Doc. 226-11). There, Congress stated it was investigating matters regarding misconduct and was "concerned that a pervasive and systematic problem exists" in sports. (*Id.*). In response, USTA reported it was aware of 27 incidents of sexual abuse within its governance in the previous five years. (*Id.*).

The USTA states the district court misstated this evidence because these reported incidents did not involve USTA employees. (IB, p. 74). Not so. The undisputed evidence shows the USTA was asked to report the number of complaints and allegations of sexual abuse made to the USTA. (Doc. 226-11). In response, it identified 27 reports, which it admitted was "chronically underreported." (Doc. 260, 65:8–67:10). This evidence was sufficient for a jury to determine the USTA was aware of the dangers associated with the coaching relationship specifically within the sport of tennis. Whatever ambiguities there may be about which of these incidents were related to coaches or other actors is for the jury to weigh.

Notwithstanding the risks, the USTA admitted it did not supervise McKenzie during any of her tennis practices with Aranda. (Doc. 262, 26:5–16). Such failure was not the result of an inadvertent mistake or oversight, but rather was the result of the USTA's admitted policy of not supervising practices even considering the ample notice of the inherent risks involved with the sport. In other words, the USTA was aware of the inherent and well-documented dangers associated with the coaching relationship, was aware that Aranda was scheduling practices alone with McKenzie on secluded tennis courts, (Doc. 225-11), was aware (through Battaglia) that Aranda had a history of sexually assaulting women and chose to leave McKenzie alone

and unsupervised. A jury was entitled to review this evidence and determine the USTA exhibited a conscious disregard or indifference to the life, safety, or rights of McKenzie. *See* Fla. Stat. § 768.72(2).

The evidence does not end there. Despite being notified of—and acknowledging—the dangers associated with private coaching, the USTA actively resisted the implementation of policies designed to protect athletes. In 2012, after the USOC circulated mandatory minimum protections for athletes, the USTA stated it was "stunned" the USOC was taking the position to "dictate" minimum standards. (Doc. 226-9). The USTA compared the minimum protections to "bullying and harassment" by the USOC. (*Id*.). Over three years after the USTA was informed that athletes could not consent to sexual contact with their coaches, <u>regardless of age</u>, the USTA continued to oppose prohibiting nonconsensual relationships between athletes and coaches. According to its written statements, such sexual relationships were <u>so common</u> that a complete ban would not be "realistic in tennis." (Doc. 226-10).[15] This evidence demonstrates the USTA was aware of <u>nonconsensual</u> relationships between athletes and coaches and yet continued to actively defend such "relationships." Taking this evidence in the light most favorable

---

[15] Let's not hide behind euphemisms here. Strip away the lawyerly phrasing, and the USTA was arguing that it is too difficult to prevent male coaches from having sex with female tennis players, so it shouldn't be prohibited. A reasonable jury could find this is outrageous and grossly negligent.

to McKenzie, a jury could find the USTA was consciously indifferent to the safety of athletes like McKenzie, and created a culture where coaches were permitted to engage in inappropriate sexual relationships. (Doc. 260, p. 238) (discussing USTA's ability to affect the "culture" of tennis).

USTA asks this Court to interpret the evidence as the USTA attempting to distinguish between consensual and nonconsensual coach/athlete relationships. (IB, p. 69). This misses the point. Perhaps the USTA is correct that there can be consensual sexual activity between a coach and an athlete, that the theory of inherent power imbalance is wrong, that coaches and athletes should be allowed to have sexual relationships, and that the Center, Congress, and millions of parents of young female athletes are wrong on this point. But a jury can reasonably disagree—as this jury did. The evidence was sufficient for a jury to determine the USTA's resistance to athlete protections exhibited a conscious disregard to McKenzie's safety.

This is merely a summary of some of the extensive evidence supporting the jury's finding of punitive damages. The jury also heard evidence that USTA employees had been trained on how to identify grooming behaviors for many years. (Doc. 260, 54:8–10). But the USTA did not provide <u>any</u> education or training to players or families—*i.e.*, the only people even potentially present at unsupervised practices—on how to identify grooming

behaviors within the coaching relationship. (*Id.*, 106:22–107:2); (Doc. 264, 5:1–5); (Doc. 264, 83:23–84:20). The USTA also failed to train Battaglia on her mandatory reporting duties, including her ability to report misconduct anonymously. (Doc. 262, 111:5–8). These additional failures reasonably support the jury's finding that the USTA exhibited a conscious indifference toward the safety of players. Respectfully, the USTA was not so unlucky as to be saddled with an unreasonable jury. The jury was instructed on and applied the correct standards and performed its duty reasonably, with ample evidence supporting its gross negligence finding. The USTA's recruitment of McKenzie away from her family and home, only to saddle her with a sexual predator as a "coach" and then exert precisely zero effort to protect her, warranted punitive damages.

There was also evidence a reasonable jury could have interpreted as the USTA's attempt to silence victims of sexual misconduct, including McKenzie. McKenzie testified that after the assault was reported to the USTA, one of the few people that contacted her was Malmqvist, who advised her not to tell anyone what had happened. (Doc. 264, 17:2–16). The jury also heard from International Tennis Hall of Fame member, Pam Shriver, who connected with McKenzie about their shared stories of experiencing abuse from their coaches. (Doc. 262, 53:3–14). Shriver testified that she was approached by

the USTA's general counsel not long after meeting McKenzie, during which USTA's general counsel warned Shriver "to be careful" and cautioned her against "enter[ing] this space." (Doc. 262, 60:10–11). Shriver testified that she was offered a prestigious position by the USTA one week after she agreed to give a deposition for McKenzie, which was understandably suspicious to her, ultimately leading her to decline the position. (Doc. 262, 61:14-63:4).

The jury also heard from Bellis, a close friend of McKenzie's whom she turned to after her assault. (Doc. 264, 28:5–9). Soon after Bellis met with the USTA's General Manager about McKenzie's abuse (a meeting to which McKenzie was not invited), Bellis without explanation cut off all ties and communication with McKenzie. (Doc. 264, 29:1–23). McKenzie's counsel argued in closing argument that the sum of this evidence illustrated the USTA "circled their wagons to make sure they protected themselves at the expense of Kylie [McKenzie]." (Doc. 265, 195:2-13). This is evidence that a reasonable jury could (and did) find support for the imposition of punitive damages. *Termilus v. Marksman Sec. Corp.*, No. 15-61758-CIV, 2016 WL 6212990, at *11 (S.D. Fla. June 27, 2016) (attempts to silence victims can support punitive damages). The district court did not err in denying USTA's JMOL as to punitive damages.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment entered by the district court.

Dated: March 24, 2025

Respectfully submitted,

/s/ *Amy Judkins*
Amy L. Judkins
NEWSOME MELTON
201 S. Orange Ave
Suite 1500
Orlando, FL 32801
(407) 648-5977
ajudkins@newsomelaw.com
lusardi@newsomelaw.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains <u>12,308</u> words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Georgia 14-point font.

Dated: March 24, 2025

/s/ *Amy Judkins*
Amy L. Judkins

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

/s/ *Amy Judkins*
Amy L. Judkins

*Counsel for Plaintiff-Appellee*