# No. 24-12966

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

UNITED STATES TENNIS ASSOCIATION INCORPORATED;
USTA PLAYER DEVELOPMENT INCORPORATED,

*Appellants*,

v.

KYLIE MCKENZIE,

*Appellee.*

————————

On Appeal from the United States District Court
for the Middle District of Florida, No. 6:22-cv-00615-PGB-LHP
Hon. Paul G. Byron

————————

## REPLY BRIEF FOR APPELLANT

————————

Kevin W. Shaughnessy
Meagan L. Martin
BAKER & HOSTETLER LLP
200 S. Orange Ave., Ste. 2300
Orlando, FL 32801
(407) 649-4000

Jeffrey S. Bucholtz
Paul Alessio Mezzina
Amy R. Upshaw
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellants*

May 14, 2025

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with 11th Cir. Rule 26.1-1(a), the following is a list of all known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations with an interest in the outcome of this case or appeal:

1. Ackerbaum Cox, Joyce, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

2. Allard, Robert, counsel for Plaintiff-Appellee Kylie McKenzie

3. Arch Capital Group Ltd. [ACGL], parent company of Arch Insurance North America

4. Arch Insurance North America, insurance carrier (as successor in interest to Allianz Global Corporate & Specialty SE) for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

5. Baker & Hostetler LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

6. Boskovich, Mark J., counsel for Plaintiff-Appellee Kylie McKenzie

7. Hon. Byron, Paul G., U.S. District Court Judge

8. Bucholtz, Jeffrey S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

9. Cerri, Boskovich & Allard, LLP, counsel for Plaintiff-Appellee Kylie McKenzie

10. Freeman, E. Caroline, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

11. Hoffman Price, Leslie, U.S. Magistrate Judge

12. Judkins, Amy L., counsel for Plaintiff-Appellee Kylie McKenzie

13. King & Spalding LLP, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

14. Luka, Maegen Peek, counsel for Plaintiff-Appellee Kylie McKenzie

15. Martin, Meagan L., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

16. McKeever & Seidule, counsel for Plaintiff-Appellee Kylie McKenzie

17. McKenzie, Kylie, Plaintiff-Appellee

18. Mezzina, Paul Alessio, counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

19. Newsome Melton, P.A., counsel for Plaintiff-Appellee Kylie McKenzie

20. Normand, Edmund A., counsel for Plaintiff-Appellee Kylie McKenzie

21. Normand Law, PLLC, counsel for Plaintiff-Appellee Kylie McKenzie

22. Sales, Erin M., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

23. Seidule, Nicholas D., counsel for Plaintiff-Appellee Kylie McKenzie

24. Shaughnessy, Kevin W., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

25. Soles, Maureen B., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

26. United States Tennis Association Incorporated, Defendant-Appellant

27. Upshaw, Amy R., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

28. USTA Player Development Incorporated, Defendant-Appellant

29. Weber, William S., counsel for Defendants-Appellants United States Tennis Association Incorporated; USTA Player Development Incorporated

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the United States Tennis Association Incorporated and USTA Player Development Incorporated certify that they are not a publicly held corporation, they have no parent company, and no publicly held company has 10% or greater ownership in the United States Tennis Association Incorporated and USTA Player Development Incorporated.

Dated: May 14, 2025

Respectfully submitted,

*s/Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .............................. C-1

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION ..................................................................................1

ARGUMENT ..........................................................................................3

I.   USTA Is Entitled to JMOL or a New Trial on Plaintiff's
     Claim for Negligent Supervision/Retention ....................................3

     A.   Battaglia's Knowledge Cannot Be Imputed to USTA
          as a Matter of Law .................................................................3

     B.   At Minimum, the Claim of Negligent
          Retention/Supervision Should Have Been Decided
          by the Jury ...........................................................................11

II.  USTA Is Entitled to JMOL or a New Trial on Plaintiff's
     Negligence Claim ...........................................................................14

     A.   USTA Exercised Reasonable Care as a Matter of
          Law .......................................................................................14

     B.   At Minimum, the Jury Was Entitled to Determine
          Whether USTA Exercised Reasonable Care ..........................21

III. USTA Is Entitled to JMOL on Punitive Damages .........................23

CONCLUSION ....................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Standard Credit, Inc. v. Nat'l Cement Co.,*
643 F.2d 248 (5th Cir. 1981)..................................................9

*Beck v. Deloitte & Touche, Deloitte,*
*Haskins & Sells, Ernest & Young, L.L.P.,*
144 F.3d 732 (11th Cir. 1998)..............................................8

*Boynton v. Burglass,*
590 So. 2d 446 (Fla. 3d DCA 1991) ....................................16

*Bric McMann Indus. Inc.*
*v. Regatta Beach Club Condo. Ass'n,*
378 So. 3d 652 (Fla. 2d DCA 2023) ....................................24

*Chang v. JPMorgan Chase Bank, N.A.,*
845 F.3d 1087 (11th Cir. 2017)..............................................3

*Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo,*
357 So. 3d 703 (Fla. 4th DCA 2023)....................................30

*Dickson v. Graham-Jones Paper Co.,*
84 So. 2d 309 (Fla. 1955) ........................................7, 8, 10

*EEOC v. Massey Yardley Chrysler Plymouth, Inc.,*
117 F.3d 1244 (11th Cir. 1997)............................................21

*Fla. Power & Light Co. v. Dominguez,*
295 So. 3d 1202 (Fla. 2d DCA 2019) ..................................25

*Garcia v. Duffy,*
492 So. 2d 435 (Fla. 2d DCA 1986) ..............................12, 14

*Handley v. Werner Enters., Inc.,*
2023 WL 6628921 (11th Cir. Oct. 11, 2023).......................21

*Jacksonville, T. & K.W. Ry. Co.*
*v. Peninsular Land, Transp. & Mfg. Co.,*
9 So. 661 (Fla. 1891)..............................................8, 9, 11

*Kazanjian v. Sch. Bd. of Palm Beach Cnty.*,
   967 So. 2d 259 (Fla. 4th DCA 2007) .................................................. 18

*L.A. Fitness Int'l, LLC v. Mayer*,
   980 So. 2d 550 (Fla. 4th DCA 2008) .................................................. 17

*Limones v. Sch. Dist. of Lee Cnty.*,
   161 So. 3d 384 (Fla. 2015) ..................................................................... 18

*Nova Se. Univ., Inc. v. Gross*,
   758 So. 2d 86 (Fla. 2000) ...................................................................... 18

*Palm Bay Towers Condo. Ass'n v. Marrazza*,
   404 So. 3d 552 (Fla. 3d DCA 2025) ................................................... 25

*Republic of Honduras v. Philip Morris Cos.*,
   341 F.3d 1253 (11th Cir. 2003) .............................................................. 5

*Sanders v. City of Belle Glade*,
   510 So. 2d 962 (Fla. 4th DCA 1987) .................................................. 17

*Schulz v. Pa. R.R.*,
   350 U.S. 523 (1956) .............................................................................. 14

*Special Olympics Fla., Inc. v. Showalter*,
   6 So. 3d 662 (Fla. 5th DCA 2009) ...................................................... 16

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
   580 U.S. 405 (2017) ................................................................................ 5

*State Farm Mut. Auto. Ins. Co. v. Duckworth*,
   648 F.3d 1216 (11th Cir. 2011) ............................................................ 24

*Termilus v. Marksman Sec. Corp.*,
   2016 WL 6212990 (S.D. Fla. June 27, 2016) ...................................... 32

*Tesla, Inc. v. Banner*,
   ___ So. 3d ____,
   2025 WL 610816 (Fla. 4th DCA Feb. 26, 2025) ................................ 25

*United States v. St. Amour*,
   886 F.3d 1009 (11th Cir. 2018) .............................................................. 6

*Valladares v. Bank of Am. Corp.*,
  197 So. 3d 1 (Fla. 2016) ...............................................................23, 24

*Vaziri v. Jerkins*,
  400 So. 3d 634 (Fla. 4th DCA 2025) ...................................................25

*Wiendl v. Wiendl*,
  371 So. 3d 964 (Fla. 2d DCA 2023) ....................................................25

## Statutes

Pub. L. No. 115-126,
  132 Stat. 318 (2018) .........................................................................6

Fla. Stat. § 768.72.......................................................................23, 30, 31

Fla. Stat. § 768.725.............................................................................25

## Other Authorities

Adams, Susan
  *The State of the Office Romance, 2013*,
  Forbes.com (Feb. 13, 2013) ...............................................................27

Garber, Greg
  *Myskina's Relationship with Coach Sometimes Stormy*,
  ESPN.com (June 16, 2004) ................................................................27

## INTRODUCTION

Plaintiff does not dispute that USTA complied with the Center for SafeSport's Code, which was designed to provide a safe athletic environment. USTA's employees underwent background checks. They received annual training on preventing and recognizing misconduct. And USTA's policies clearly defined misconduct. When Plaintiff reported Aranda, USTA immediately banned him and reported him to the Center. USTA thus acted reasonably as a matter of law. At minimum, USTA was entitled to have the jury decide whether it acted reasonably.

Plaintiff's defense of the JMOL in her favor on the knowledge and breach elements of her negligent retention/supervision claim defies both law and fact. Battaglia's knowledge of the 2014 nightclub incident cannot be imputed to USTA as a matter of law, so USTA is entitled to judgment. At the very least, a jury could have found that USTA lacked constructive notice that Aranda was unfit to coach Plaintiff.

The JMOL for Plaintiff on the negligence claim must also be reversed. Plaintiff largely retreats from defending the district court's reasoning. She insists from the first sentence of her brief that this case involves "a heightened duty of care." Br. 1; *accord id.* at 13, 16, 17, 18, 23,

46. But the district court rejected that argument, holding that USTA had "only a duty of reasonable care," "*not* … a heightened duty." Dkt.164 at 27. Plaintiff needs to invoke this fictional "heightened duty" because she essentially asks this Court to adopt a new rule that cannot possibly be justified under a reasonable-care standard: a third person must be constantly present to observe an adult athlete's training with a coach. Br. 20-27 (arguing USTA's duty required it to "monitor" practices so Aranda and Plaintiff were never alone together). That rule has no basis in the evidence or Florida law. Because USTA complied with the proper standard of care, it is entitled to judgment. At minimum, a jury could have found that USTA took reasonable actions to provide a safe environment. The district court accordingly erred by deciding key elements of Plaintiff's claims in her favor as a matter of law.

Finally, there is no legal or factual basis for punitive damages. On appeal, Plaintiff does not contend that she presented clear and convincing evidence of gross negligence equivalent to the conduct involved in criminal manslaughter, as required by Florida law. Instead, she argues for a lower standard. But the Florida Supreme Court has adopted the higher standard. And no matter what standard applies,

Plaintiff's quibbles over policy redlines and grab-bag of accusations with no connection to Aranda's assault come nowhere near establishing gross negligence.

## ARGUMENT

I. **USTA Is Entitled to JMOL or a New Trial on Plaintiff's Claim for Negligent Supervision/Retention.**

   A. **Battaglia's Knowledge Cannot Be Imputed to USTA as a Matter of Law.**

Plaintiff concedes that to prevail on this claim, she had to prove USTA knew Aranda was unfit to coach adult athletes. Br. 29. Plaintiff does not dispute that Battaglia was the only USTA employee with knowledge of any prior misconduct by Aranda.

Under Florida law, an employee's knowledge can be imputed to her employer only if it falls "within the scope of her authority." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017). The evidence showed that Battaglia lacked any authority over Aranda, which Plaintiff never disputes. USTA Br. 30; Pl. Br. 47. Instead, Plaintiff relies on two theories of imputation—principally that Battaglia's knowledge is "chargeable" to USTA because Battaglia had "a duty to communicate" her own victimization to USTA, Br. 31, and also that Battaglia's duties and status support per se imputation, Br. 40-42. Neither theory works.

***First***, Battaglia had no duty as a matter of law to communicate her victimization to USTA for three independent reasons. The Code does not force victims to self-report. The Code's reporting duty does not cover misconduct toward adult non-athletes like Battaglia. And the Code's reporting duty runs to the Center, not USTA.

**a.** Plaintiff does not dispute the fundamental background principle that victims of sexual misconduct are not obligated to report their own victimization. *See* Br. 37-40. As Dr. Applewhite testified, that principle is longstanding. Dkt.264 at 279. The Code specifies that in the event of doubt regarding a reporting obligation, questions should be directed to the Center. Dkt.95-6 at PageID 1609 § II.A.2.b. The Center's Senior Legal Counsel swore the Code was never intended to require victims to self-report. *See* Dkt.97-8 ¶ 7; Dkt.164 at 16. But because the district court held at summary judgment that Battaglia "lost the option of keeping silent" about the 2014 incident when she later accepted a job change, Dkt.164 at 15-16 & n.3, the court disregarded that declaration and later versions of the Code explicitly incorporating that position, *see* Dkt.177 at 95-105, when it granted JMOL to Plaintiff regarding knowledge, *see* Dkt.264 at 135-36; Dkt.265 at 62-63.

Rather than identify any evidence to contravene Dr. Applewhite's testimony that victims are not required to self-report, Plaintiff argues an employee's reason for not reporting does not bear on imputation. Br. 37-40. That misses the point. The issue is whether Battaglia owed USTA a reporting duty in the first place. Under the Code, she did not.

At trial, Plaintiff advocated treating the Center's Code as federal law so the court could ignore the undisputed evidence of the background rule and the Code's consistent interpretation. *See, e.g.*, Dkt.262 at 92-96; Dkt.264 at 223-24, 226-27, 262-67. However, the interpretation of federal law does not permit courts to close their eyes to background principles or the ordinary interpretation of terms. *Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253, 1259 (11th Cir. 2003); *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017). Moreover, the Center's Code is *not* federal law and cannot constitutionally be treated as such. USTA Br. 32-33. Plaintiff's only response is that this Court can treat the Code as binding law because USTA did not raise the non-delegation argument in its JMOL motion. Br. 33-34. USTA was not required to raise that argument in its JMOL motion, however, because before that point, the district court had acknowledged that the Code was "not the law,"

Dkt.177 at 104. Only in denying USTA's post-trial motion did the court change gears and declare that the Code *is* the law because it "is incorporated into the Safe Sport Act." Dkt.247 at 22. USTA is entitled to challenge that erroneous ruling, and by failing to defend it on the merits Plaintiff effectively concedes error.

**b.** The Code's reporting requirements apply to misconduct toward athletes and minors, not adult coworkers. Plaintiff suggests there is no difference, Br. 35, but that is belied by the Center's—and Plaintiff's—recognition that the existence of a coach-athlete relationship is relevant to evaluating conduct. *See, e.g.*, Dkt.95-6 at PageID 1601 § II.Q.1; Br. 7. Plaintiff contends the Code's literal text extends its reporting requirements to all misconduct, regardless of who is involved. Br. 35-37. But any text must be "construe[d] … as a whole." *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018) (per curiam). The context of the Code is the Center's jurisdiction "with regard to safeguarding amateur *athletes* against abuse … in sports." Pub. L. No. 115-126, § 202(a), 132 Stat. 318, 320 (2018) (emphasis added). The Code explicitly does not replace organizations' employment practices, Dkt.95-6 at PageID 1596 § 1.D.1.b, and Dr. Applewhite testified that because the

6

Code was "really designed to address and protect athletes and minors who are athletes," it does not apply to "a peer-to-peer employment situation" like the 2014 incident, Dkt.264 at 264.

**c.** The Code only requires individuals to report qualifying information to the Center, not USTA. *See* USTA Br. 36. Plaintiff does not argue otherwise. Instead, she argues that the Code was incorporated into USTA's policies, Br. 34-35, but that does not change to whom information was to be reported. Under Florida law, an employee's knowledge can be imputed to her employer only when she owes a duty to "communicate the knowledge *to the corporation.*" *Dickson v. Graham-Jones Paper Co.*, 84 So. 2d 309, 310 (Fla. 1955) (emphasis added).

Plaintiff also argues USTA had a separate mandatory reporting requirement. Br. 35. Notably, Plaintiff's citation to USTA's policy has no pin cite, likely because she was unable to find a mandatory reporting requirement applicable to Battaglia and the 2014 incident. *Id.* (citing Dkt.225-4). The evidence, in fact, shows that Battaglia became a mandatory reporter of athlete and child abuse only upon her 2017 job change and after the Code was created. *See* Dkt.260 at 88-89; 209-10; Dkt.262 at 91-97, 107-08; Dkt.264 at 279-81.

**Second**, Battaglia's other duties did not give rise to imputation. To be chargeable to an employer, an employee's knowledge must concern "some fact connected with the *particular* duties that the [employee] is authorized to perform for the [employer]." Pl. Br. 31 (emphasis added) (quoting *Jacksonville, T. & K.W. Ry. Co. v. Peninsular Land, Transp. & Mfg. Co.*, 9 So. 661, 686 (Fla. 1891)). The district court cited two bases for holding as a matter of law that Battaglia's knowledge was automatically imputed: that Battaglia was "[v]ery high up in the chain" and was "placing coaches with athletes." Dkt.265 at 62. Neither has evidentiary support. *See* USTA Br. 29-32.

Plaintiff now backs away from those findings as "irrelevant." Br. 41. She contends an employee need not be high in the chain for her knowledge to be imputed. But the inquiry is whether the employee's knowledge is within her authority. *See Jacksonville*, 9 So. at 687; *Dickson*, 84 So. 2d at 310. An employee in a high position will have a broad scope of authority, supporting imputation. *See, e.g.*, *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) ("In normal circumstances, the knowledge of a corporation's directors … is imputed to the corporation."); *Am. Standard*

*Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 270 n.16 (5th Cir. 1981) (notice to agent in position of general authority, *e.g.*, CEO, is always deemed notice to the principal). Here, the district court reasoned that Battaglia's knowledge was within her authority *because* she was "very high up in the chain." Because that is inaccurate, USTA Br. 30, there was no basis for the court's finding that Battaglia was so "high … in her position," Dkt.265 at 62, that all her knowledge was imputable.

Plaintiff also argues that it does not matter that Battaglia was never responsible for "pairing coaches with athletes," contrary to the court's finding. Br. 41; Dkt.265 at 62. The uncontroverted evidence established that Battaglia "[n]ever" matched players to coaches and was involved only with "logistics and planning." Dkt.265 at 53; Dkt.262 at 85. Moreover, neither Aranda nor Plaintiff was ever part of the program for which Battaglia worked on logistics and planning. Dkt.265 at 53. As Plaintiff elsewhere acknowledges, to be imputed, the employee's knowledge must concern "some fact connected with [her] particular duties." Br. 31 (quoting *Jacksonville,* 9 So. at 686); *see Jacksonville*, 9 So. at 686-87 (where there was insufficient evidence of employee's duties, instructing jury that employee's knowledge was imputed was error);

*Dickson*, 84 So. 2d at 309-10 (manager's knowledge of vicious animal he kept on premises was "not imputable" to employer where keeping animal was not within scope of manager's authority). Battaglia's knowledge had no connection to her duties to organize logistics and planning for events Aranda had nothing to do with.

Perhaps recognizing that Battaglia's particular duties do not support imputation, Plaintiff argues that USTA's generalized responsibility to safeguard athletes means that *anything* potentially related to athlete safety is necessarily within the scope of *every* employee's authority. Br. 31-32. There was no evidence, however, that USTA expected employees to disclose their own victimization— particularly when, as here, the victim never thought there was any implication for athlete safety, Dkt.262 at 126, 129. Furthermore, Plaintiff did not argue below—and the court did not hold—that Battaglia's knowledge could be imputed based on some generic duty applicable to all USTA employees, without a specific, mandatory reporting requirement. *See, e.g.*, Dkt.264 at 151-52; Dkt.247 at 22.

**B.    At Minimum, the Claim of Negligent Retention/ Supervision Should Have Been Decided by the Jury.**

At the very least, the district court erred by granting Plaintiff JMOL on the knowledge and breach elements of her claim of negligent retention/supervision. First, to the extent there is a fact question about the scope of Battaglia's authority, that should go to the jury. Second and independently, even if Battaglia's knowledge were properly imputed to USTA, a jury still should determine whether knowledge of the 2014 nightclub incident meant that USTA knew that Aranda was unfit to coach adult players four years later.

*First*, Plaintiff does not dispute that an employee's duties are an issue of fact. *See* USTA Br. 37; *see, e.g.*, *Jacksonville*, 9 So. at 686-87. Instead, Plaintiff argues that Battaglia's "manager" title and the fact that she had *some* involvement with the mentorship program suffice for imputation. Br. 40-41. But there was ample evidence, including testimony regarding Battaglia's and USTA's understanding of Battaglia's duties, from which a jury could have concluded that her authority did not extend to Aranda or otherwise require her to report the 2014 incident to USTA. *See* USTA Br. 37-38. Plaintiff contends that the fact that Battaglia never paired athletes with coaches but was simply

involved with logistics and planning for the mentorship program is "a distinction without a difference," Br. 41, but a reasonable jury could disagree.

**Second**, even if Battaglia's knowledge of the 2014 incident were imputed to USTA, that would raise the factual question of whether that knowledge established that USTA knew Aranda was unfit to coach. Plaintiff does not dispute that under Florida law, the factors affecting an employee's fitness will "vary with the circumstances of each case." *Garcia v. Duffy*, 492 So. 2d 435, 441 (Fla. 2d DCA 1986). To prove negligent retention/supervision, a plaintiff must show the employer had actual or constructive knowledge about the employee that made it foreseeable that he would engage in the particular type of conduct at issue. *Id.* at 441-42. The jury was entitled to make that call. USTA Br. 38-42.

Plaintiff inaccurately claims "[i]t was undisputed that Battaglia knew Aranda was unfit for employment," premised on the idea that the 2014 nightclub incident necessarily made Aranda unfit to coach Plaintiff in 2018. Br. 14. She also contends that foreseeability relates only to duty and causation, not breach. Br. 43. Both arguments fail.

**a.** Plaintiff equates knowledge of the 2014 incident in which Aranda inappropriately touched a peer on a nightclub dance floor with knowledge that Aranda was unfit to coach Plaintiff four years later. *See, e.g.*, Br. 30, 31. Plaintiff ignores ample testimony distinguishing the two incidents, which a reasonable jury could credit.

Dr. Applewhite testified that the context of the 2014 incident meant it was not the type of misconduct addressed by the Code. Dkt.264 at 264. Battaglia testified that the context was "entirely different" and that she did "not in any way, shape, or form … think that" Aranda's behavior toward her while drinking and dancing in a nightclub "would translate to his behavior as a coach on court." Dkt.262 at 129. Many of the factors the Code identifies as relevant to evaluating potential misconduct, such as age, roles, and power differential, *see* Dkt.95-6 at PageID 1601-02 § II.R, were starkly different between the incidents, USTA Br. 40. Reasonable jurors could credit that testimony and those distinctions and conclude that even if Battaglia's knowledge of the 2014 incident were imputed, USTA did not know as a result that Aranda was unfit to coach Plaintiff in 2018. That reasonable people could have disagreed about whether the 2014 incident made Aranda unfit to coach four years later is

illustrated by the Center's response to Aranda's assault of Plaintiff. Even after that assault of a player he was coaching, the Center would have permitted Aranda to return to coaching after two years' suspension and two years' probation. Dkt.226-2 at 8.

**b.** Plaintiff also contends that "foreseeability" relates only to duty and causation. Br. 42-45. In fact, "[t]he factors constituting … employee fitness … and the type of action reasonably required of the employer," which vary in each case, are critical to determining "breach." *Garcia*, 492 So. 2d at 441. The inferences to be drawn from any imputation of knowledge of the 2014 incident therefore should have been resolved by the jury.

## II. USTA Is Entitled to JMOL or a New Trial on Plaintiff's Negligence Claim.

### A. USTA Exercised Reasonable Care as a Matter of Law.

The district court held as a matter of law that USTA breached its duty of reasonable care. Dkt.265 at 86. Whether a defendant has acted reasonably depends on "the circumstances of [the] particular case[]." *Schulz v. Pa. R.R.*, 350 U.S. 523, 525 (1956). Here, the undisputed evidence established that the Center's Code set forth the relevant standard of care for an adult athlete participating in a sport under

Olympic Committee jurisdiction. Dkt.264 at 211-14, 218-19. Plaintiff does not dispute that USTA fully complied with that standard of care. That alone warrants reversal.

Plaintiff does not seriously defend the district court's bases for denying USTA JMOL: that USTA purportedly did not follow its own "rule of three" and did not monitor video feeds. *See* Dkt.247 at 17-18. Instead of identifying evidence that USTA breached the Code's standard, Plaintiff invents a new "heightened" standard of care under which a sports organization is per se negligent if a coach is ever alone on a court with an adult player. *See* Br. 21-24 (arguing that allowing practices without an observer necessarily constituted breach).

***First***, Plaintiff is right to abandon the district court's flawed reasoning. Despite the court's suggestion that USTA should have employed real-time video monitoring, there was no evidence that such a practice was required or even feasible. USTA Br. 44-45. The court's finding that USTA failed to follow its rule of three was wrong as a matter of fact (because USTA followed that policy) and as a matter of law (because USTA's policy does not define the standard of care). USTA Br. 45-50.

**Second**, Plaintiff's new negligence rule has no support in the district court's ruling, Florida law, or the facts.

**a.** Plaintiff relies heavily on the "special relationship" the court found between USTA and Plaintiff, claiming the court held that "USTA owed McKenzie a *heightened duty* of care under Florida's 'special relationship' test," Br. 17 (emphasis added). That is false. The court's finding of a special relationship established an exception to the ordinary rule that a person has *no* duty to protect another from a third party's actions. *See Boynton v. Burglass*, 590 So. 2d 446, 448 (Fla. 3d DCA 1991). The court explicitly rejected Plaintiff's argument for a *heightened* duty, *i.e.*, a duty greater than reasonable care. Dkt.164 at 27; *contra* Br. 13, 16-18. It held that USTA had "a duty of reasonable care to protect players in their training program from sexual abuse by their coaches … *not* … a heightened duty to make every effort so that abuse is impossible." Dkt.164 at 27-28; Dkt.247 at 10 (question is whether USTA took "reasonable care" to protect athletes).

A special relationship does not make one a guarantor of safety. In *Special Olympics Florida, Inc. v. Showalter*, 6 So. 3d 662, 667 (Fla. 5th DCA 2009) (per curiam), for example, the court reversed for a new trial

where the jury "was improperly advised that, by statute, the [plaintiffs] were guaranteed 'the right to be free from harm.'" Even when a special relationship exists, the defendant may still be entitled to JMOL. *See, e.g.*, *Sanders v. City of Belle Glade*, 510 So. 2d 962, 965 (Fla. 4th DCA 1987); *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 556-59 (Fla. 4th DCA 2008).

**b.** Plaintiff claims that because USTA was bound by a heightened duty, it was required to "supervise McKenzie during her training sessions with Aranda." Br. 13. In other words, Plaintiff's theory is that two USTA employees had to be with her at all times. That per se double-supervision rule has no basis in Florida law.

In certain circumstances, Florida law recognizes a duty to reasonably supervise individuals within a defendant's care. But none of Plaintiff's cited authorities suggests that "supervision" of an adult means constant monitoring by one employee—let alone two. In *Limones v. School District of Lee County*, for example, the court held that the "special relationship" between schools and students "requires a school to reasonably supervise its students during all activities that are subject to the control of the school, even … adult students." 161 So. 3d 384, 390 (Fla.

2015). It did not define supervision, much less define it as constant monitoring by two separate teachers. *Cf. Kazanjian v. Sch. Bd. of Palm Beach Cnty.*, 967 So. 2d 259, 261, 266-68 (Fla. 4th DCA 2007) (holding high school did not have duty to prevent student from walking off campus unauthorized). Plaintiff also cites *Nova Southeastern University, Inc. v. Gross*, 758 So. 2d 86 (Fla. 2000). There, the court held that the university owed a duty of reasonable care toward adult students it assigned to internships. *Id.* at 89. That duty was tied only to the decision of which internship locations to assign; it did not require the university to observe students traveling to their internships. *Id.* at 89-90. Plaintiff has identified no Florida decision imposing the double-supervision rule she asks the Court to adopt.

Nor did the district court adopt such a rule. Plaintiff suggests the court held that USTA's duty required it to prevent a coach and an adult player from training one-on-one. Br. 13, 19-21. She misconstrues the court's holding. The court stated that one of the *reasons* it found a special relationship was that "players like McKenzie rely on Defendants to take reasonable steps to prevent opportunities for abuse … , *like* limiting instances in which a coach and player can be alone and wholly

unmonitored … ." Dkt.164 at 27 (emphasis added). It did not hold that the duty established by that special relationship created a per se rule that USTA had to prevent an adult athlete from training one-on-one with a coach.

**c.** The evidence showed that USTA took reasonable steps to protect athletes. It was undisputed that the Code set out the standard of care for these circumstances—*i.e.*, it defined how a reasonable national governing body should take steps to protect adult athletes. USTA fully complied with the Code by conducting background checks for employees; requiring employees to complete annual, Center-provided training; and establishing clear conduct policies. USTA Br. 43-44; Dkt.264 at 213-19. It also went above and beyond the Code by mandating additional trainings for coaches and by maintaining an open and observable training environment (which the Code requires only for minors). USTA Br. 43-49.

USTA's expert witness testified that USTA adequately supervised Aranda's practices with Plaintiff. Dkt.264 at 252, 281. Although Plaintiff now contends that "supervision" requires ensuring that a third person is *always* present during an adult athlete's training, *see* Br. 13, 19-28,

Dr. Applewhite explained that supervision in this context is a broader concept:

> [S]o there's his supervision and then there's sort of the supervision of the place. Because it's one thing to supervise a coach, but it's another thing to also have the players, the athletes, and other people who have involvement with others. … [S]ay you have an isolated athlete that's just working with one coach. That puts them in a much more vulnerable situation than being in a big place with lots of people, lots of people influencing the athlete. … It's a type of supervision where you're more likely to find out that something's going wrong with a coach.

Dkt.264 at 282-83. Plaintiff would have the Court ignore Dr. Applewhite's testimony, which she mischaracterizes as opining that USTA "had no obligation to supervise" her. Br. 25. In fact, Dr. Applewhite testified that "supervis[ion]" differs for children and adults and a sports organization is not required to monitor an adult athlete's training sessions (for example, using a policy like the rule of three). Dkt.264 at 234, 275, 277. The evidence clearly established that USTA took reasonable steps to "supervise" adult athletes' practices, including Plaintiff's. Dkt.264 at 282-83; *see also* Dkt.262 at 26 (testimony regarding oversight of coaches); Dkt.260 at 223-24, 245-47 (similar).

**B.    At Minimum, the Jury Was Entitled to Determine Whether USTA Exercised Reasonable Care.**

Given USTA's commitment to following the Code and implementing its own protective policies, whether USTA exercised reasonable care was at least a jury question. *See Handley v. Werner Enters., Inc.*, 2023 WL 6628921, at *3 (11th Cir. Oct. 11, 2023) (per curiam) ("[G]ranting judgment as a matter of law in favor of a party bearing the burden of proof" is "an 'extreme step' which 'can be done only when the evidence favoring the claimant is so one-sided as to be of overwhelming effect.'" (quoting *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997))).

The record showed that USTA took seriously its duty of reasonable care. It complied with every feature of the Code and also took proactive steps to root out potential bad actors in tennis, even if those actors were not USTA employees. After Plaintiff reported her assault, USTA immediately conveyed that information to the Center and, after the Center's investigation, barred Aranda for life. Dr. Applewhite, the sole expert who testified at trial regarding the standard of care, testified that USTA met that standard. Dkt.264 at 219. Plaintiff chose not to even call her own standard-of-care expert after that expert testified during her

deposition that USTA "had in place adequate mechanisms to observe interactions between coaches and athletes" and had a "laudable" open environment. *See* Dkt.96 at 9-10 (quoting Dkt.97-4 at 49, 50).

Plaintiff's sole argument in response is that the jury should be deemed to have decided the negligence elements in her favor, even though the court took away the issue from the jury in its JMOL order, because the jury awarded punitive damages. Br. 28. In fact, the punitive-damages award only highlights how the court's legal errors infected the verdict. The court instructed the jury to accept an incorrect application of law to the facts—that USTA was negligent—and then asked the jury to measure the extent of that determined negligence. Dkt.219 at 9. That is a flawed inquiry. Consider an analogy. If a court were to instruct a jury that, as a matter of law, Hank Aaron was a professional football player and then ask the jury to determine whether Aaron was a *great* professional football player, an affirmative answer by the jury would not justify the court's erroneous conclusion that Aaron played professional football. It would only underscore that the court's legal error infected the jury's analysis. The same is true here. The trial court instructed the jury as a matter of law that USTA acted negligently. That instruction infected

the jury's analysis. An untainted review of the record here establishes that JMOL in favor of USTA is appropriate, not the other way around. At the very least, the record created an issue of fact for the jury.

## III. USTA Is Entitled to JMOL on Punitive Damages.

No reasonable jury could find the standard for punitive damages was met. Under Florida law, punitive damages are an extraordinary remedy, and the "required level of negligence … is equivalent to the conduct involved in criminal manslaughter." *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 11 (Fla. 2016). Punitive damages may be awarded against an employer for an employee's conduct only if the employer's managing agents "engaged in conduct that constituted gross negligence," defined as conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Fla. Stat. § 768.72(3)(c), (2)(b).

Likely because the facts here do not come close to that standard, Plaintiff's central argument is that a more lenient standard applies. Br. 47-48. Florida precedent defeats that argument. Moreover, no matter what standard applies, the evidence cannot justify punitive damages.

***First***, Plaintiff acknowledges that as recently as 2016, the Florida Supreme Court described "the required level of negligence for punitive damages [as] equivalent to the conduct involved in criminal manslaughter." *Valladares*, 197 So. 3d at 11; *see* Br. 47. Yet she asks this Court to ignore the Florida Supreme Court's pronouncement on the ground that it is supposedly inconsistent with amendments the Florida legislature made to the punitive-damages statute *17 years earlier*, in 1999. Br. 48. Regardless of whether Plaintiff thinks Florida's highest court has misconstrued Florida law, this Court is bound to follow the Florida Supreme Court's decision. *State Farm Mut. Auto. Ins. Co. v. Duckworth*, 648 F.3d 1216, 1224 (11th Cir. 2011).

Plaintiff's single cited authority does not support her argument. Br. 48. In *Bric McMann Industries Inc. v. Regatta Beach Club Condominium Ass'n*, the plaintiff sought punitive damages for "intentional misconduct"—not "gross negligence." 378 So. 3d 652, 654 (Fla. 2d DCA 2023). The court held that the criminal-manslaughter standard had no bearing on "the statutory definition of 'intentional misconduct.'" *Id.* at 655. The court did not address the standard for gross negligence, and the same court has cited *Valladares* and the criminal-

manslaughter standard as controlling for gross negligence. *Fla. Power & Light Co. v. Dominguez*, 295 So. 3d 1202, 1206 (Fla. 2d DCA 2019); *Wiendl v. Wiendl*, 371 So. 3d 964, 968 (Fla. 2d DCA 2023). Here, Plaintiff's theory is that USTA engaged in gross negligence. As other Florida appellate courts have explained, *Valladares* "reaffirmed the applicability" of the "criminal manslaughter" standard following the 1999 amendment of the punitive-damages statute. *Tesla, Inc. v. Banner*, ___ So. 3d ____, 2025 WL 610816, at *3 (Fla. 4th DCA Feb. 26, 2025); *see also, e.g.*, *Palm Bay Towers Condo. Ass'n v. Marrazza*, 404 So. 3d 552, 558-59 (Fla. 3d DCA 2025); *Vaziri v. Jerkins*, 400 So. 3d 634, 638 (Fla. 4th DCA 2025). Plaintiff's failure to argue that she can satisfy the punitive-damages standard as authoritatively construed by Florida courts, *see* Br. 47-55, warrants judgment for USTA on this issue.

**Second**, no matter what standard applies, punitive damages would not be warranted, and certainly not by "clear and convincing evidence," Fla. Stat. § 768.725. The district court found "competent" evidence to support the award because USTA had disagreed with some aspects of draft policies proposed by the Center; did not monitor all practices in real time and purportedly did not follow its own rule of three; and supposedly

"had direct reports of 27 sexual assaults by coaches before" Plaintiff was assaulted. Dkt.247 at 28-30; *but see* USTA Br. 44-50, 61-62.

Plaintiff repeats those points and additionally argues that USTA failed to train players and their families to recognize grooming; that USTA failed to adequately train Battaglia regarding anonymous reporting; and that *after* USTA reported Aranda to the Center, USTA "attempt[ed] to silence" victims. Br. 50-55. This scattershot of arguments could not even establish ordinary negligence, let alone warrant punitive damages.

**a.** Plaintiff focuses on USTA's comments on draft policies the Center circulated to national governing bodies years before Aranda's assault. *See* Br. 50, 52. USTA's redlines on policies irrelevant to these facts do not come close to clear and convincing evidence of gross negligence. USTA's comment on the Committee's 2012 proposal to impose mandatory policies on organizations that had long enforced their own protective policies shows that USTA criticized *the Committee's* expansion of its own role, USTA Br. 56, not that USTA "resisted" having protective policies in place, Pl. Br. 52.

USTA's comments in 2015 regarding relationships where one party is in a "position of power," *see* Dkt.226-10 at 16, do not support Plaintiff's position either. The proposed policy required freely given consent from someone of competent age. *Id.* at 15. USTA did not disagree with that important principle. However, the proposed policy also declared categorically that "[c]onsent is not possible" when "one person in a relationship holds a superior position of power over the other." *Id.* at 16. USTA suggested this broad statement was "not realistic in tennis" because a power imbalance "could go either way" and it is not uncommon in tennis for a professional player (who would be outside USTA) to date a coach. *Id.*; *see* Dkt.260 at 99. All this redline shows is that USTA questioned the Center's initial belief that every single relationship involving any kind of position of power is automatically nonconsensual.[1]

---

[1] USTA rejects the reprehensible suggestion that it "defend[ed]" *nonconsensual* relationships. Pl. Br. 52 & n.15. It is far from grossly negligent to suggest that some romantic relationships involving a coach and a player (whether advisable or not) do not necessarily give rise to sexual assault. Examples abound. *See, e.g.*, Greg Garber, *Myskina's Relationship with Coach Sometimes Stormy*, ESPN.com (June 16, 2004) (listing four professional women's tennis players married to their coaches); *cf.* Susan Adams, *The State of the Office Romance, 2013*, Forbes.com (Feb. 13, 2013) ("Barack and Michelle Obama, who met at a Chicago law firm in 1989 when he was a summer associate and she was his supervisor, are certainly not alone.").

Indeed, the Center's final rule, which USTA implemented, acknowledged this point, defining as misconduct any "intimate relationship involving a person in a position of power *where a power imbalance exists*"—but clarifying this is not *always* the case when one person is in a "position of power." *See* Dkt.95-6 at PageID 1601-03 §§ II.R, III.A.1.d (emphasis added) (capitalization omitted); Dkt.225-4 at 3, 19-20.

Plaintiff claims a reasonable jury could find from these redlines that USTA disregarded athletes' safety. Br. 53. Likewise, she argues that USTA exhibited conscious disregard by not ensuring a third person constantly observed her practices. Br. 51-52. However, Plaintiff does not cite any supporting authority or engage with *any* of USTA's cited cases in which Florida courts held that even evidence that an employer was aware of misconduct by a specific employee, or aware of a specific risk at a specific location, was insufficient to support punitive damages when that employee committed additional misconduct or that risk manifested. *Compare* USTA Br. 58-60 *with* Pl. Br. 49-55. Those cases establish that the evidence here comes nowhere close to Florida's high standard.

**b.** Plaintiff doubles down on the district court's misstatement of the evidence regarding allegations of sexual abuse of which USTA became

aware between 2013 and mid-2018. *See* Pl. Br. 50-51; USTA Br. 62. Plaintiff claims USTA reported 27 incidents of sexual abuse "within its governance." Pl. Br. 50. But neither the congressional committee's request nor USTA's response asserted the reported incidents were "within [USTA's] governance," and *none* involved a USTA employee. Dkt.226-11; Dkt.226-12; Dkt.260 at 102-03. USTA proactively sought information regarding accusations of sexual abuse by *anyone* involved in tennis *anywhere* in the world and chose to report all that information to Congress. Dkt.260 at 96-97, 101-02. This is cause to praise USTA, not punish it.

**c.** Plaintiff also asserts USTA did not train players or their families on how to identify grooming (although it did train all employees) and did not train Battaglia regarding anonymously reporting misconduct (referring to Battaglia's testimony regarding her *Center-provided* training). Br. 53-54 (citing Dkt.260 at 54; Dkt.262 at 111); *see* Dkt.260 at 77, 82 (undisputed evidence that Center provided this training). But Plaintiff does not explain how either of these amounts to even *ordinary* negligence.

**d.** Last, Plaintiff contends that a reasonable jury could have found that USTA attempted to "silence" her, citing events *after* Aranda assaulted her and USTA immediately reported Aranda to the Center. Br. 15, 54-55. However, "actions taken after ... a tortious act are not admissible on the issue of punitive damages, nor can those subsequent actions form the basis for" such a claim. *Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So. 3d 703, 707 (Fla. 4th DCA 2023); *see* Fla. Stat. § 768.72(c) (gross negligence must have "contributed to" injury); USTA Br. 55 n.7.

Even if these events *could* be considered, the three events Plaintiff cites are not clear and convincing evidence of gross negligence.

After USTA reported Aranda to the Center, Ola Malmqvist called Plaintiff. According to Plaintiff, Malmqvist expressed "that he was sorry and to not say anything, and since people would be wondering where I was ... to just tell them that I was sick." Dkt.264 at 17. Malmqvist testified that USTA wanted to respect Plaintiff's privacy and ensure that Plaintiff knew she did not have to disclose to others what happened unless "she wanted to mention it." Dkt.260 at 254. Plaintiff interpreted the conversation as suggesting that she not tell anyone of the assault.

Dkt.264 at 17. But because USTA had already reported the assault to the Center, the notion that USTA acted to "silence" her, Br. 54, makes no sense and certainly is not supported by clear and convincing evidence.

Next, Plaintiff refers to a conversation between USTA's general counsel and Pam Shriver, a USTA Foundation board member and former tennis player, more than three-and-a-half years after Aranda's assault. *See* Dkt.262 at 56. A year after that conversation, Shriver was identified as a potential witness in this lawsuit. Dkt.263 at 168. USTA later suggested Shriver apply for an open position for an international competition—for which no one contends Shriver was unqualified. Dkt.262 at 60-61. Plaintiff does not explain how events years after Aranda's assault "contributed" to her injury, Fla. Stat. § 768.72(c).

Finally, Plaintiff notes that her friend CiCi Bellis stopped communicating with her after the assault. Br. 55. After Bellis helped Plaintiff report the assault, Bellis's agent recommended that Bellis meet with Martin Blackman, USTA's General Manager. Dkt.264 at 175. Blackman wanted to ensure Bellis had not been mistreated by Aranda when he coached her, which she had not. *Id.* at 165-66, 175. No evidence

shows that Bellis's stopping communicating with Plaintiff had anything to do with USTA.

Plaintiff has no authority for the suggestion that these events support punitive damages. The sole case Plaintiff cites, *see* Br. 55, does not address whether Florida law permits punitive damages for conduct occurring solely after the injury. *See Termilus v. Marksman Sec. Corp.*, 2016 WL 6212990, at *11 (S.D. Fla. June 27, 2016), *report and recommendation adopted in part*, 2016 WL 6237264 (Sept. 1, 2016). In *Termilus*, the court held that the defendant's attempts to "silence" the victim were part of a pattern of harassment that a jury could find supported a hostile-work-environment claim. *Id.* at *11-12. That decision has no application here.

## CONCLUSION

This Court should reverse the district court's judgment and direct the entry of judgment in favor of USTA. Alternatively, the Court should vacate the judgment, order a new trial on liability and compensatory damages, and direct the entry of judgment in favor of USTA on Plaintiff's request for punitive damages.

Respectfully submitted,

*s/Jeffrey S. Bucholtz*

| | |
|---|---|
| Kevin W. Shaughnessy | Jeffrey S. Bucholtz |
| Meagan L. Martin | Paul Alessio Mezzina |
| BAKER & HOSTETLER LLP | Amy R. Upshaw |
| 200 S. Orange Avenue | E. Caroline Freeman |
| Ste. 2300 | KING & SPALDING LLP |
| Orlando, FL 32801 | 1700 Pennsylvania Avenue NW |
| (407) 649-4000 | Washington, DC 20006 |
| | (202) 737-0500 |
| | jbucholtz@kslaw.com |

*Counsel for Appellants*

May 14, 2025

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,496 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: May 14, 2025

*s/Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2025, the foregoing was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*s/Jeffrey S. Bucholtz*

Jeffrey S. Bucholtz

*Counsel for Appellants*